315 F.2d 856
 AMERICAN AGRICULTURAL CHEMICAL COMPANY, Appellant,
v.
TAMPA ARMATURE WORKS, INC. and Fidelity & Casualty Company of New York, Appellees.
AMERICAN AGRICULTURAL CHEMICAL COMPANY, Appellant,
v.
Fred S. NYE et al., Appellees.
 No. 19943.
 No. 19944.
 United States Court of Appeals Fifth Circuit.
 April 4, 1963.
 
 T.J. Blackwell, Willis H. Flick, Edward L. Magill, Miami, Fla., Blackwell, Walker & Gray, Miami, Fla., for appellant.
 William T. Keen, Thomas C. MacDonald, Jr., Tampa, Fla., Shackleford, Farrior, Stallings, Glos & Evans, Tampa, Fla., of counsel, for appellees.
 Before BROWN, GEWIN, and BELL, Circuit Judges.
 GRIFFIN B. BELL, Circuit Judge.
 
 
 1
 George I. Powell and Fred S. Nye, employees of Tampa Armature Works, Inc., brought separate suits against appellant American Agricultural Chemical Company, seeking damages for personal injuries suffered on the property of appellant and which allegedly resulted from the negligence of appellant. The facts giving rise to each suit were the same, and appellant filed third-party actions in both against Tampa Armature Works, Inc., and its insurer, Fidelity and Casualty Company of New York, appellees here.
 
 
 2
 The facts and the applicable law relating to each third-party action were the same. In each instance, the third-party complainant sought indemnification from the third-party defendants for any recovery which the respective plaintiffs might obtain against appellant, together with the third-party plaintiff's attorneys fees and the costs of litigation. In each instance, the court overruled motions for summary judgment filed by appellant as third-party plaintiff, and granted summary judgments in favor of appellees, the third-party defendants. These are appeals, consolidated for decision, from the final judgments entered under Rule 54(b), F.R.Civ.P.
 
 
 3
 When injured, Powell and Nye were employed by Tampa Armature as electricians. In turn, Tampa Armature was at the time engaged in installing electrical work in connection with the construction of expanded facilities for appellant at its phosphorous works in Pierce, Florida. The work was being done pursuant to a written contract between appellant, as owner, and Tampa Armature, as contractor.
 
 
 4
 Powell and Nye were injured on the job site while installing electrical conduits for their employer under the contract when they inhaled phosphorous fumes set loose by employees of appellant. They each collected workmen's compensation benefits from their employer, and filed the tort suits against appellant which gave rise to these appeals.
 
 
 5
 Appellees refused on demand to take over the defense of the suits and the third-party complaints followed. In the meantime each suit has been settled by appellant with Powell and Nye.
 
 
 6
 Appellant claimed contractual indemnity from Tampa Armature and its insurer, and common law indemnity from Tampa Armature. We do not reach the question of common law indemnity in view of our holding on contractual indemnity.
 
 
 7
 Contractual indemnity from Tampa Armature was premised on the provisions of Article 9 of the contract between appellant and Tampa Armature. Appellees contend that this article must be construed in conjunction with Articles 8 and 10. The three articles, seriatim, are:
 
 
 8
 "Article 8 — DAMAGE TO PROPERTY
 
 
 9
 "(a) Work, Materials and Equipment — The Contractor shall be responsible for all work, materials and equipment covered by this contract and, in case of loss or damage prior to the completion and final acceptance of the work by an authorized representative of the Owner, shall repair or replace the same at his own expense.
 
 
 10
 "(b) Property of the Owner — The Contractor shall be responsible for and make good to the satisfaction of the Owner any loss of or damage to existing structures and property belonging to the Owner if such loss or damage is due to the negligence or wilful acts or omissions of the Contractor, his employees, agents, representatives or subcontractors.
 
 
 11
 "(c) Property of the Public — The Contractor shall indemnify and save the Owner harmless from all claims for damage to property other than the Owner's property arising under or by reason of this Agreement if such claims result from the negligence or wilful acts or omissions of the Contractor, his employees, agents, representatives or subcontractors.
 
 
 12
 "Article 9 — INJURY TO PERSONS —
 
 
 13
 "Contractor shall indemnify and save Owner harmless from all claims for injuries to or death of any and all persons including without limitation, employees, agents and servants of Contractor or its subcontractors, arising out of or in connection with or by reason of the work done by Contractor, its employees, agents, representatives or subcontractors."
 
 
 14
 "Article 10 — EQUIPMENT AND EMPLOYEES OF THE OWNER —
 
 
 15
 "The Contractor's responsibility for damage to property and injury to or death of persons as set forth in Articles 8 and 9 includes damage, injury, or death caused in whole or in part by any machinery, tools, or equipment belonging to the Owner and used by the Contractor, or his subcontractors, in the performance of this Agreement, or caused by negligence or wilful acts or omissions of any employee of the Owner while such employee is acting under the direction or control of the Contractor or its subcontractors and in his behalf carrying out for him the work to be performed under this Agreement."
 
 
 16
 Contractual indemnification was claimed from the insurer on the basis of the requirements of the contract that Tampa Armature carry workmen's compensation and employer's liability insurance, contractor's public liability insurance, and automobile liability insurance in stated amounts at its own expense with companies satisfactory to appellant. It was agreed that Tampa Armature would have the insurance carrier certify to appellant that all insurance required under the contract was in force and would not be cancelled without notice to appellant. The insurer issued a certificate to appellant reflecting that it had issued the required insurance to Tampa Armature, which certificate contained the substance of Article 9 under the heading "Remarks":
 
 
 17
 "Hold Harmless Agreement
 
 
 18
 "Contractor shall indemnify and save Owner harmless from all claims for injuries to or death of any and all persons including without limitation, employees, agents and servants of Contractor or its subcontractors, arising out of or in connection with or by reason of the work done by Contractor, its employees, agents, representatives or subcontractor."
 
 
 19
 The separate issue of whether appellant is entitled to indemnification from the insurer of the contractor as a third-party beneficiary is not now before the court. It is implicit from the record that the insurer to date has been treated as having the status of standing in the shoes of Tampa Armature. This was made clear on argument. This leaves for decision the matter of contractual indemnity as between appellant and the contractor, Tampa Armature.
 
 
 20
 The controlling facts are essentially undisputed, and our conclusion rests on what we deem to be the meaning of Article 9 of the contract. Appellees contend that Article 9 created no obligation on the part of Tampa Armature to indemnify appellant under these circumstances where the injuries to Powell and Nye resulted solely from the negligence of appellant. Their argument goes that there is no express language that the contractor would indemnify the owner for injuries to its employees resulting from the negligence of the owner, and that Articles 8, 9 and 10 considered together make it plain that this was not to be the case. It is the position of appellant owner, on the other hand, that this question is controlled to the contrary by Jacksonville Terminal Co. v. Railway Express Agency, Inc., 5 Cir., 1962, 296 F.2d 256, cert. den., 369 U.S. 860, 82 S.Ct. 949, 8 L.Ed.2d 18.
 
 
 21
 That case, just as this, involved a Florida contractor. We pointed out there that Florida law controlled the construction and validity of the indemnity clause in dispute, and that under Florida law, as elsewhere, the cardinal rule of construction is to ascertain the intention of the contracting parties and to give effect to that intention if it can be done consistently with legal principles. Where the language chosen by the parties, given its ordinary and natural meaning, unambiguously manifests that intention, the judicial task is at an end.
 
 
 22
 The pertinent provision of the contract there was:
 
 
 23
 "* * * it is hereby expressly stipulated that the said Express Company will fully indemnify and save harmless the said Terminal Company * * * from and against all charges, expenses, loss, damage, injuries, suits, or judgments, arising by reason of or in connection with occupation and use of the premises of the Terminal Company by the Express Company under this agreement, whether to the property of, or persons in employ of, the Terminal Company * * *."
 
 
 24
 A switchman employed by the Terminal Company was injured while performing duties in connection with the switching of express cars for the Terminal Company on the property leased to Railway Express when he stepped on a rotten crosstie and fell. The Terminal Company under the contract was to maintain the track at the expense of the Express Company. He was provided medical services and paid for lost time. He sued in the state court and collected a money judgment from the Terminal Company. Railway Express rejected the demand of the Terminal Company to defend the suit, and for indemnity. We held in the resulting suit for indemnity that Railway Express was required to indemnify the Terminal Company for the sums paid the switchman, plus the expense incurred in defending the state court suit.
 
 
 25
 Our conclusion rested on the basis that the words "in connection with" in an indemnity contract are to be given their natural and ordinary meaning, and thus the injuries sustained arose in connection with the occupation and use of the premises by Railway Express. We also concluded that under Florida law an indemnity contract, to be effectual, need not contain an express stipulation to include indemnity for loss resulting from the negligence of the indemnitee. The intention need only appear clearly and unequivocally. See Jackson v. Florida Weathermakers, Fla., 1951, 55 So.2d 575; and Annotation, Limiting Liability for Own Negligence, 175 A.L.R. 12, Part IV, p. 20 et seq. We also noted, citing Russell v. Martin, Fla., 1956, 88 So.2d 315, that such a contractual provision is not against public policy.
 
 
 26
 There the person injured was the employee of the indemnitee. Here the employees are those of the indemnitor. Nevertheless, by analogy, the facts here are well within the ambit of that decision, and it is controlling.
 
 
 27
 Our view is substantiated by the express terms of Article 9. Under it the contractor agreed to indemnify and save the owner harmless "from all claims for injuries to * * * any and all persons including without limitation, employees * * * of the contractor arising out of or in connection with or by reason of the work done" under the contract. The work being done by Powell and Nye was work of the contract. They were injured in connection with that work by an agency of the owner. Their injuries are clearly embraced by the terms of this article. The contract contemplated specifically that the plant of the owner would be in continuous operation while the work of the contract took place. The employees of the contractor would, of necessity, be subjected to the hazards of the business of the owner. These very injuries occurred in this manner.
 
 
 28
 Articles 8 and 10 in no way limit the broad terms of Article 9 as neither covers the subject matter of Article 9. Article 8, more narrow in scope, has only to do with property damage. Article 10 has to do with damage or injuries resulting from the use by the contractor of machinery, tools, or equipment of the owner, or resulting from the negligence or wilful acts or omissions of employees of the owner being used by the contractor. Article 9 is the only provision in the contract having to do with injuries suffered by persons in the category of Powell and Nye. It was a normal provision to place in a contract for the protection of the owner where employees of another would be carrying on their duties on the property of the owner. Buffa v. General Motors Corporation, E.D. Mich., 1955, 131 F.Supp. 478.
 
 
 29
 Nor are the broad terms of Article 9 in any way limited, as appellees contend, by the maxim expressio unius est exclusio alterius by reason of the inclusion in Article 10 of the responsibility of the contractor for the machinery and employees of the owner while being used or acting under the direction of the contractor in carrying out the work of the contract. It was an inclusion and nothing more, — in terms — a part of the responsibility assumed under Articles 8 and 9.
 
 
 30
 The responsibility of the contractor for the claims of Powell and Nye is clear and unequivocal. They are embraced in the language "all claims * * * of any and all persons." The injuries forming the basis of the claims were sustained "in connection with" the work of the contract. The parties to the contract agreed to and did cover the responsibility by insurance. The coverage purchased and accepted was comprehensive liability including automobile, with a specific representation as to Article 9 coverage. This is akin to the modern practice referred to in Crescent Towing & Salvage Co. v. Dixilyn Drilling Corp., 5 Cir., 1962, 303 F.2d 237, cert. granted, 371 U.S. 859, 83 S.Ct. 121, 9 L.Ed.2d 98, of providing liability insurance to cover the negligence of the indemnitee with the parties bargaining as to which is to bear the expense of the insurance.
 
 
 31
 Appellant as third-party plaintiff moved for summary judgment against appellees. These motions were heard along with the motions of appellees. It was error to grant the motions of appellees for summary judgment, but the motions of appellant in each case should have been granted. We reverse so that this may be done.
 
 
 32
 Reversed and remanded for further proceedings not inconsistent herewith.
 
 
 33
 JOHN R. BROWN, Circuit Judge, (concurring).
 
 
 34
 I concur in the decision and the opinion. I also concur that the decision of Jacksonville Terminal Co. v. Railway Express Agency, Inc., 5 Cir., 1962, 296 F. 2d 256, cert. denied, 369 U.S. 860, 82 S. Ct. 949, 8 L.Ed.2d 18, on this record is controlling.
 
 
 35
 But while I am bound by that decision as a holding, I am not bound by all that was said in support of it. At least I would suppose that I am no more bound than that panel considered it was as to the reasons expounded for the Court by me in Batson-Cook Co. v. Industrial Steel Erectors, 5 Cir., 1958, 257 F.2d 410.
 
 
 36
 What I particularly disagree with is the lecture which this Court undertakes to give all that vast body of courts — including this very court — who through the years had molded what was to become the majority view that "while it need not be done in any particular language or form, unless the intention is unequivocally expressed in the plainest of words, the law will consider that the parties did not undertake to indemnify one against the consequences of his own negligence." 257 F.2d 410, 412.
 
 
 37
 After first making an Erie-reading of the Florida law by which, of course, we are bound, the Court went on to reject "the majority rule" because it "rests on an unsound and dangerous foundation."[1] 296 F.2d 256, 262. Two arguments were then advanced. The first was to decline to accept the idea that assumption of liability of losses due to another's negligence is an "unusual" and "hazardous" undertaking. This, in turn, was based upon a supposed similarity to obligations which compensated insurers willingly take on themselves in modern insurance policies. Amplifying that a bit, the Court asserted a "common knowledge that the device of insuring against one's own negligence through indemnity contracts is frequently employed in other business ventures." 296 F.2d 256, 262.
 
 
 38
 As to the first phase, I would have considerable doubt that parties to an ordinary commercial business construction contract may be likened to an insurance company. As to the use of the indemnity agreement as a device for risk allocation or sharing, I quite agree that it is frequently and effectively used. But in most instances, as is true here, the underlying insurance which insures compliance with the indemnity agreement merely guarantees compliance by the assured (the indemnitor) of whatever obligations the indemnity contract prescribes. The presence of insurance then is really question-begging: if the indemnity contract subjects the indemnitor to liability, the underwriter is also liable;[2] if it does not, then the underwriter has no liability except to defend the baseless charge asserted under the indemnity agreement.[3]
 
 
 39
 But doubtful as is this first reason, what is even more disturbing is the second reason advanced by the Court:
 
 
 40
 "Perhaps more important, even assuming that the burden imposed on the indemnitor is `unusual' or `hazardous', the majority rule presumes that courts have the power to alleviate or eliminate this burden by construing the indemnity agreement in a manner which is patently inconsistent with the plain and clear meaning of the language employed by the contracting parties. This is a dangerous and unwarranted extension of the judicial function." 296 F.2d 256, 262.
 
 
 41
 This is quite a broadside to level at all of the courts who have fashioned the majority rule. I would hardly think it a "dangerous and unwarranted extension of the judicial function" to determine just what it is the law considers to be "the plain and clear meaning of the language employed by the contracting parties." I do not believe it is judicial usurpation if a given court finds the task of interpretation and application of written contract terminology to be something that is not automatically revealed. It is not abandoning the judicial role for a court to conclude that the answer is not disclosed by a mechanical resort to the so-called "cardinal rule of construction" which "is to ascertain the intention of the contracting parties and to give effect to that intention if it can be done consistently with legal principles." 296 F.2d 256, 259.
 
 
 42
 Of course this is both an artificial and generally meaningless test as everyone knows. For in the so-called quest for the intention of the parties, the last thing that is ever allowed is to make inquiry of either one or both of them. The law for policy reasons too good and too numerous to here outline prohibits ordinarily any subjective inquiry or statement. In the final analysis, the "intention" of the parties is that which the law declares the parties in that particular circumstance by that particular language must have meant to say.[4]
 
 
 43
 Where, for example, this Court at this late date now declares that the reasons previously advanced by the majority of courts for requiring an unequivocal manifestation of a purpose to take on the burdens of another's neglect are unsound, there are many who still adhere to that view. Many other courts have applied it for years. Thus in one state a particular contract is held to satisfy that forum's standard of specificity. In another, substantially identical language will be found wanting. Each of those courts is engaged in a proper judicial function — that of ascertaining what it is the law of that particular jurisdiction, in keeping with its traditions and policies, regards the words used to mean.
 
 
 44
 Of course the best proof of this is the ceaseless problem of interpreting virtually standard clauses of contemporary insurance policies. In many such situations, the clauses are simple in structure and terminology. Words of common everyday meaning, both to the business and legal world, are used. And yet in the hairsbreadth of the imaginary line separating one state from a contiguous one, diametrically opposite conclusions are reached in "construing" identical words. Thus, on the troublesome problem of "Who is the Insured?" and the corollary application of the standard employee exclusion clause, Louisiana answers it one way,[5] while its sister States of Texas[6] and Alabama[7] reach an opposite result.
 
 
 45
 Obviously an insurer issuing the identical policy in Louisiana and Texas does not intend two different results. Equally obvious, a multi-state corporate assured procuring such insurance from that insurer for its nation-wide operations does not intend the coverage to be different between Texas and Louisiana. Despite the obvious fact that very plain, simple words are used in the questioned policy clause, it could hardly be said that merely because divergent results are reached, one of the two courts is "construing the * * * agreement in a manner which is patently inconsistent with the plain and clear meaning of the language employed by the contracting parties" so that it is engaged in the "dangerous and unwarranted extension of the judicial function." 296 F.2d 256, 262.
 
 
 46
 Each forum has its own reasons, either good or bad, for reading the supposed intention of parties in a uniform contract in a contrary way. The sharp disagreement between the conflicting courts, and even among the Judges of the same courts,[8] and the criticism of writers in professional journals demonstrate that even out of plain, everyday, simple English words of common usage, a judicial problem exists.[9] Its resolution in the light of local policy considerations,[10] though perhaps erroneous, is a long way from judicial usurpation.
 
 
 47
 The problem, then, is one of judicial interpretation. As with any other judicial problem, it is not avoided because the words in question are simple or plain or common. One state for perfectly good reasons may conclude that the word "all" means something less. It may, for example, believe that while such indemnity contracts are not void, it is unwise for its citizens to be exposed to almost unlimited liability[11] precipitated by the negligence of the very person being indemnified unless that purpose is spelled out with positive clarity. Such a rule, if adopted, represents a state policy — a state policy which we are neither competent nor free to judge. Businessmen contracting in the light of it can protect themselves accordingly. A businessman, with or without insurance, might be willing to take on himself the liabilities of an indemnity agreement under such an interpretation. On the other hand, unless he obtains insurance or renegotiates the contract price, he might be unwilling to become a virtual, unlimited, uncompensated insurer under the other interpretation. Where this rule — one way or the other — is announced by clear state precedents, it is as much a part of the meaning of the word "all" as are the letters a-1-1.
 
 
 48
 When a state to effectuate what it considers to be good, valid state policies, puts a narrower — or a broader — interpretation on language used than might be compelled by our notion of mere literalism, I decline to say, not only that the result is erroneous, but that in reaching it the court has transgressed the judicial boundary.
 
 
 49
 To the contrary, so long as Erie stands, for us to say so may itself be "a dangerous and unwarranted extension of the judicial function," and especially the function of the national judiciary in this area of diversity federalism.
 
 
 
 Notes:
 
 
 [1]
 This admonitory lecture was subsequently repeated in Crescent Towing & Salvage Co. v. Dixilyn Drilling Corp., 5 Cir., 1962, 303 F.2d 237, 244, cert. granted, 371 U.S. 859, 83 S.Ct. 121, 9 L.Ed.2d 98, and now pending
 
 
 [2]
 Of course in the interpretation of the insurance guaranty of such indemnitee, I would be the first to acknowledge that, as should be true of all insurance, it must be read in the light of the practical business demands and risks. Jewelers Mutual Ins. Co. v. Balogh, 5 Cir., 1959, 272 F.2d 889, 892; XXVIII Ins. Counsel J. 576-584 (1961)
 
 
 [3]
 The cost, inconvenience, and burden of defending a baseless claim is itself one of the persuasive business reasons for their use. Consequently, a non-negligent indemnitee does have a business need for an indemnity agreement. This factor is completely overlooked in what the Court elucidates as an additional reason given note 4, 296 F.2d 256, 263. Likewise, overlooked by the Court was the disturbing and serious procedural problem of great practical importance as to contribution or indemnity among joint tort feasors, the application of major-minor, active-passive concepts, imposition of liability without actual fault under non-delegable duties, or the like. See Travelers Ins. Co. v. Busy Electric Co., 5 Cir., 1961, 294 F.2d 139, 143 and 144, and Halliburton Co. v. Norton Drilling Co., 5 Cir., 1962, 302 F.2d 431, on rehearing 313 F. 2d 380. An express contractual indemnity agreement wipes out all of these vexing problems with the wave of a hand
 
 
 [4]
 The words of the contract are not even the starting point. We have many times pointed out that "A court called upon to determine the meaning of written contracts * * * looks primarily to the language of the contractsafter first placing itself as nearly as possible in the position of the parties to them at the time of their execution." (Emphasis supplied.) Fidelity-Phenix Fire Ins. Co. v. Farm Air Service, Inc., 5 Cir., 1958, 255 F.2d 658 at 660; Indemnity Ins. Co. of North America v. Du Pont Air Interests, 5 Cir., 1961, 292 F.2d 569; United States Industries, Inc. v. Camco, Inc., 5 Cir., 1960, 277 F.2d 292, 295-296, note 14.
 
 
 [5]
 Stewart v. Liberty Mutual Ins. Co., 5 Cir., 1958, 256 F.2d 444
 
 
 [6]
 Transport Ins. Co. v. Standard Oil Co., 1959, 161 Tex. 93, 337 S.W.2d 284
 
 
 [7]
 American Fidelity & Casualty Co. v. Saint Paul Mercury Indemnity Co., 5 Cir., 1957, 248 F.2d 509; Michigan Mutual Liability Co. v. Carroll, 1961, 271 Ala. 404, 123 So.2d 920
 
 
 [8]
 See, e.g., the strong, and in my judgment, correct dissent of Justice Walker in Transport Ins. Co. v. Standard Oil Co., 1959, 161 Tex. 93, 337 S.W.2d 284, 290. Even more in point are the recent indemnity contract decisions in Ohio Oil Co. v. Smith, 1963, Tex., 365 S.W.2d 621, reversing Tex.Civ.App., 356 S.W.2d 443, and Spence & Howe Construction Co. v. Gulf Oil Corp., 1963, Tex., 365 S.W.2d 631, aff'g Tex.Civ.App., 356 S.W. 2d 382. Here coordinate courts of a single system reach opposite results and the "intention" of the parties is not determined until still another agency — the Supreme Court — speaks. Incidentally all had difficulty with the case of Westinghouse Electric Corp. v. Childs-Bellows, Tex.Civ.App., 1961, 352 S.W.2d 806, writ ref., which bears much resemblance to this Florida case
 
 
 [9]
 Oddly enough, in the illustration of a uniform, simple insurance clause which I have discussed, "Who Is `The Insured'", Risjord and Austin, 24 University of Kansas City L.Rev. 65 (1955), undertaking as it did to demonstrate that the new "Severability of Interests" clause was really unnecessary to express the underwriters' intention as recognized by court decision may have become a part of the problem. Some of its judicial statistics were questioned in American Fidelity & Casualty Co. v. St. Paul Mercury Indemnity Co., 5 Cir., 1957, 248 F.2d 509, 514, note 9. This may have led the Texas Supreme Court into its holding in Transport Insurance Co. v. Standard Oil Co. of Texas, 1959, 161 Tex. 93, 337 S.W.2d 284, at 289. This result occurred even though Justice Walker pointed out, correctly I believe, that the severability clause was present in the Texas case, but not in our prior American Fidelity-St. Paul case. In the tortuous course of this problem, it may be that in divining intention as Alabama sees it, we transmuted McDowell v. United States Fidelity & Guaranty Co., 1954, 260 Ala. 412, 71 So.2d 64, from a simple cross-employee exception case of dubious relevance into the legendary white horse case when the Alabama Supreme Court three years later decided Michigan Mutual Liability Co. v. Carroll, 1961, 271 Ala. 404, 123 So.2d 920. All of this is developed in "Who Is `The Insured' Revisited" Risjord and Austin, XXVIII Ins. Counsel J. 100 (1961); Brown and Risjord "Loading and Unloading; The Conflict Between Fortuitous Adversaries," XXIX Ins. Counsel J. 197; see also XXVIII Ins. Counsel J. 576-584 (1961)
 
 
 [10]
 The term "policy consideration" is broadly used. One such "policy" is that in the majority of states, contracts of indemnity against one's own negligence are not void as "contrary to public policy." 296 F.2d 256, 263, note 3
 
 
 [11]
 There is no ceiling as to persons or claims. It is more wide open than the extraordinary policy which this Court declined to enforce even against a compensated insurer. See Navigazione Alta Italia v. Columbia Casualty Co. (dissenting), 5 Cir., 1958, 256 F.2d 26, 29, 1958 A.M.C. 1099