1561. *See, e. g.,* General Motors Corp. v. Washington, *supra*.

The judgment of the district court will be affirmed.

Milos ZAJICEK, Plaintiff-Appellee,

v.

UNITED FRUIT COMPANY, etc., Defendant, Third Party Plaintiff-Appellant,

v.

PANAMA FREE PORT CORPORATION, Defendant, Third Party Defendant-Appellee.

No. 29196.

United States Court of Appeals, Fifth Circuit.

April 17, 1972.

R. Phillips, Balboa, Canal Zone, Charles E. Dunbar, III, Ronald A. Johnson, New Orleans, La., for United Fruit Co.; Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., of counsel.

Harry H. Allen, Jr., Balboa, Canal Zone, for Milos Zajicek.

Woodrow de Castro, Balboa, Canal Zone, for Panama Free Port Corp.

Before JOHN R. BROWN, Chief Judge, and WISDOM and RONEY, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Carrier[1] prepared for issuance a set of bills of lading covering a shipment of sandal straps from New York to Cristobal, Panama. This set, which we refer to as First Issue, showed the order consignee to be the Panamanian agent of the Peruvian buyer of the goods. Shortly thereafter, to correct misdescription of the goods and to carry out Shipper's[2] instructions to change the consignee to Shipper's order, the Carrier issued and delivered a new set (called Second Issue) of ladings. In the meantime, although no originals of First Set had ever been executed or delivered, Carrier routinely but mistakenly sent non-negotiable copies of them to its Cristobal office. This error was compounded by its failure to send non-negotiable copies of Second Set, the true and *only* bills of lading, to the Cristobal office.

And thereby hangs this tale. For assuming First Set to be the true and only outstanding bills, Carrier's agent delivered the goods on surrender of a non-negotiable copy of First Set against a so-called letter of indemnity by Free Port.[3] By now, of course, the goods were gone, so was Shipper's security. A few weeks later Shipper, wondering about his goods, came to the Canal Zone—with originals of Second Set in hand—in search of his goods. After much effort and several investigatory trips to the Canal Zone and New York, they were never found. This suit against Carrier and Free Port followed but, unfortunately not until 16 months after actual delivery of the goods —a fact which turned an otherwise open and shut case of palpable carrier liability into one of considerable difficulty on

problems of applicability of COGSA and the statutory (and contractual) one-year limitation for suit.

The District Judge in findings which none can, or do, assail held each liable jointly and severally but with indemnity to Free Port against Carrier. Only Carrier appeals—a fact which eliminates all of the difficult problems Shipper's tardiness injected. We affirm.

*Carrier Bungles*

The facts in this case are really undisputed. Shipper's claim is for misdelivery of a cargo of sandal straps shipped from New York to Cristobal, Panama on Carrier's S/S Telde. In April, 1966, Shipper purchased the sandal straps from the Atlas Trading Corporation and subsequently on May 2, 1966, sold them to Chia Hermanos of Lima, Peru. The purchase price of $24,189.94 was on a landed cost basis and included freight, import taxes and delivery expenses. As part of the sale Shipper assumed the duty of having the goods shipped to Lima. The first leg was to be accomplished by shipment on S/S Telde sailing from New York bound for Cristobal, Panama, on about July 8, 1966. As is customary the Atlas Corporation, Shipper's forwarder, prepared First Set bills of lading for issuance by Carrier. The cargo and the covering unexecuted bills of lading were delivered to Carrier's pier. In effect the consignee was to order of Purchaser.[4] Because First Set misdescribed the goods and Shipper wanted clean bills, Carrier was informed that a new set of bills would be submitted. Before this was done Shipper cabled instructions to change the name of the consignee, thus countermanding his original instruction as to consignee shown in First Set.

1. United Fruit Company

2. Milos Zajicek

3. Panama Free Port Corporation.
   The Trial Court found that Free Port was at all times pertinent to this controversy the agent for Perubras

S.A. It also found that this agency relationship was known to Carrier.

4. "CONSIGNED TO ORDER OF: PANAMA FREE PORT CORPORATION, C/O PERUBRAS, S.A., FREE ZONE, COLON, PANAMA."

The Second Set was then prepared, correcting the description of the goods and most importantly changing the name of the consignee to order of Shipper.[5] Carrier's managing clerk did not take notice of the changed consignee.

No original bills of lading were issued or delivered for First Set showing Perubras S.A. (order) as the consignee. But Carrier did retain several non-negotiable copies. Several of these were forwarded to Carrier's Cristobal office. In the meantime on receipt of three originals of Second Set, Atlas processed and forwarded them to Shipper's agent in Peru. Carrier's Cristobal office did not receive any copies of Second Set, the only valid documents, nor did it receive any notification that Second Set existed or had been issued and delivered.

S/S Telde sailed from New York on July 9, 1966 and arrived in Panama on July 15, 1966 shortly after which the cargo was discharged onto the dock at Cristobal where it was placed in the Panama Canal Company warehouse. The goods were held in the custody and possession of the Panama Canal Company, subject to the order of the Carrier and remained in the warehouse for approximately ten days.

On July 25, 1966, Free Port requested that Carrier release the shipment to it against non-negotiable copy of the First Set one of which Carrier's agent had sent to Free Port as notification of the shipment's arrival. Free Port did not have any original bill of lading to surrender.

Carrier demanded and received from Free Port a letter of indemnity[6] after which the shipment was accordingly released to Free Port. The shipment was then taken into the Colon Free Zone where it was entered as being the property of Perubras S.A. (the order party in First Set). The goods were then delivered to a freight-forwarder, who as far as is known, shipped the goods out of Panama.

On August 15, 1966 Shipper's agent arrived to take delivery of the shipment and presented the original bills of lading to Panama Free Port. Shipper and his agent made several inquiries about the shipment but were never able to discover its whereabouts. On January 10, 1968, over 17 months after actual delivery and 16 months after Shipper had knowledge of the misdelivery, he filed suit in the District Court for the Canal Zone, Cristobal Division against Carrier and Free Port.

From the adverse judgment against it Carrier contends that (i) under COGSA as incorporated in the bills of lading the suit is time-barred under the statutory and contractual one-year limitation, (ii) Free Port is not entitled to judgment over and against Carrier because it was negligent in not obtaining a customary letter of indemnity from Perubras S.A., (iii) Carrier, instead of indemnifying Free Port, should on its third-party complaint have received full indemnity from Free Port under the letter of indemnity, and (iv) the damages were excessive.[7]

---

5. The Second Set prescribed:
   "CONSIGNED TO ORDER OF: MILOS ZAJICEK C/O PANAMA FREE PORT CORPORATION, FREE ZONE, COLON, PANAMA."

6. Free Port's letter read:
   "We have been advised that the subject shipment has arrived and is ready for delivery. The original bills of lading, however, have not been received and we would greatly appreciate your assistance in taking delivery of this merchandise.
   "In consideration for your assistance in releasing this shipment without the surrender of the original bills of lad-

ing, we hereby release the UNITED FRUIT CO. from all claims and/or actions that may arise as a result of this release. Upon receipt of advice for payment of this merchandise including freight and handling charges. We promise to you such amount as you have been required to pay.
   "We promise to deliver to you original bills of lading within the next thirty (30) days."

7. This includes the assertion belatedly made here but not on the trial that the COGSA $500 per package limitation was controlling.

*Carrier's COGSA Attack*

Carrier from the outset strenuously urged that COGSA, having been expressly incorporated by the bills of lading [8] for post-discharge activities, automatically incorporated the statutory [9] and contractual [10] one-year time bar for suits.

Notwithstanding the arguments which rest on the sound propositions that (i) COGSA may become a part of the contract of affreightment through express incorporation [11] and (ii) that where COGSA is applicable it covers *mis*deliveries [12] as well as *non* or damaged deliveries, we find it unnecessary to reach these substantial questions or the equally countervailing contention that what the right hand had extended in the COGSA incorporation (note 8, *supra*) the left hand had taken back in a couple of "except as may be otherwise specifically provided herein" clauses,[13] the effect of

8. "1. CARRIAGE OF GOODS BY SEA ACT.
This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. The provisions stated in said Act shall (*except as may be otherwise specifically provided herein*) govern before the goods are loaded on and after they are discharged from the ship and throughout the entire time the goods are in the custody of the carrier." (Emphasis added.)

9. "In any event the carrier and the ship shall be discharged from all liability in respect of loss or damage unless suit is brought within one year after delivery of the goods or the date when the goods should have been delivered." 46 U.S. C.A. § 1303(6).

10. "18. NOTICE OF LOSS OR DAMAGE.—TIME FOR SUIT. Unless notice of loss or damage and the general nature of such loss or damage be given in writing to the carrier or his agent at the port of discharge before or at the time of the removal of the goods into the custody of the person entitled to delivery thereof under the contract of carriage, such removal shall be PRIMA FACIE evidence of the delivery by the carrier of the goods as described in the bill of lading. If the loss or damage is not apparent the notice must be given within three days of the delivery.
"In any events the carrier and the ship shall be discharged from all liability in any capacity under this bill of lading or otherwise for delay, loss of or damage to or in respect of the goods, or for loss or damage to any other property of the shipper, consignee or owner of the goods, or with respect to general average unless suit is brought within one year after the delivery of the goods or the date when the goods should have been delivered."

11. "Many bills of lading contain a provision to the effect that the Act [COGSA] shall govern rights and liabilities of the parties at all times that the cargo is in the carrier's possession, both before the cargo is stowed on and after its discharge from the carrying vessel. Such a provision makes the Act a term of the contract to be considered with the other contractual terms." Longley, Common Carriage of Cargo (1967), Pages 32–33.

12. See Bank of California N.A. v. International Mercantile Marine Corp., 2d Cir., 1933, 64 F.2d 97, 1933 A.M.C. 719, cert. denied, 1933, 290 U.S. 649, 54 S.Ct. 66, 78 L.Ed. 563; Commodity Service Corp. v. Furness Withy & Co., N.Y. City Civ.Ct., 1964 A.M.C. 760; Mamiye Bros. Barbara Steamship Lines, Inc., S.D.N.Y., 1965, 241 F.Supp. 99, 1966 A.M.C. 1175, aff'd, 2d Cir., 1966, 360 F.2d 774, 1966 A.M.C. 1165, cert. denied, 1966, 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70; Commercio Transito Internazionale, Ltd. v. Lykes Bros. Steamship Co., 2d Cir., 1957, 243 F.2d 683, 1957 A.M.C. 1188.

13. See Covenant 4:
"4. * * * When the goods are discharged from the ship, as herein provided, they shall be at their own risk and expense; *such discharge shall constitute complete delivery and performance under this contract* and the carrier shall be freed from any further responsibility. For any services rendered to the goods as hereinabove provided, the carrier shall be entitled to a reasonable extra compensation." (Emphasis added.)
And see Clause 12.
"If the goods are not taken away by the consignee by the expiration of the

which would be *contractually* withdrawing this post-discharge occurrence from COGSA.

■ All of this goes out because under the judgment Carrier is cast jointly and severally with Free Port and for reasons we now discuss Carrier cannot succeed in its dual argument that all should fall on Free Port. Since Shipper has a good collectible judgment against Free Port which is not assailable on any of the carrier-based contentions, the operation of the Rules (F.R. Civ.P. 14) in reverse makes such circuity wasteful and unnecessary. What—and all—that is left to Carrier is to prevail in its contentions (ii) and (iii) *vis a vis* Free Port that (ii) Free Port should have exacted indemnity from Perubras S.A. and (iii) indemnity should run *to* not *from* Carrier.[14]

### Free Port's Failure to Exact Indemnity

■ Carrier attacks the judgment granting indemnity to Free Port on the ground that Free Port was negligent in failing to obtain a letter of indemnity from Perubras S.A. when it released the shipment to them.

In essence, Carrier's argument is that when Free Port subsequently released the shipment to Perubras S.A. (who of course did not have the originals), without requiring a letter of indemnity, they displayed such a lack of good business judgment as to render themselves liable for the loss. Since, the argument goes on, the customary procedure of requiring a letter of indemnity was not followed and since the goods were negligently delivered, Free Port rather than Carrier should be held ultimately liable for the whole loss.

next working day after the goods are at his disposal (after discharge from the ship and notice) the goods may, at carrier's option and subject to carrier's lien, be sent to store or warehouse, or permitted to lie where landed, *but always at the risk and expense of the goods.* * * * The responsibility of the carrier in any capacity shall altogether cease and the goods shall be considered to be delivered and at their own risk and expense in every respect when taken into the custody of customs or other authorities." (Emphasis added.)

See Federal Ins. Co. v. American Export Lines, D.C.N.Y., 1953, 113 F.Supp. 540, 1953 A.M.C. 352. One clause of the contract made the COGSA applicable to the whole period of time the goods were in the carrier's custody. Somewhat as here, another clause, however, stated that all lighterage and use of craft in discharging cargo was to be at the risk and expense of the goods.

The Court declined to hold that the COGSA one-year limitation barred the claim. As though writing on the very bill of lading here involved (see note 8, *supra*) with an identical "except as otherwise provided" parenthetical, the Court stated:

"Indeed the part of clause 1 of the bill of lading which makes the Carriage of Goods by Sea Act applicable during custody contemplates such spe-

cific exceptions to that rule. It provides: 'The provisions stated in said Act (except as may be otherwise specifically provided herein) shall govern before the goods are loaded on and after they are discharged from the ship and throughout the entire time the goods are in the custody of the Carrier.' Since the question is solely one of intention, the specific controls the general and the Carriage of Goods by Sea Act does not apply to the period when cargo is on a lighter. Thus the Carriage of Goods by Sea Act does not apply in this case. Since the Act does not apply the one-year limitation which is part of the Act does not apply."

113 F.Supp. at 543.

Cf. David Crystal, Inc. v. Cunard Steam-Ship Co., 2 Cir., 1964, 339 F.2d 295, 1964 A.M.C. 1292. Unlike the contract which there gave carrier an option, which carrier did not exercise, the clause here (note 13, *supra*) provides that the carrier can do a number of things with the shipment after discharge and notice, etc., *"but always at the risk and expense of the goods."* (Emphasis added.)

14. Strictly speaking point (iv) on damages is not open since Free Port has not appealed, but we examine and reject it nevertheless.

Several answers are available. At the beginning there is no proof of quantity or quality which would compel the Judge to find the existence of any such custom or the prudence of it. Second we cannot discern how it would avail Carrier. That Free Port might have two indemnities to save it whole—(1) Carrier and (2) Perubras S.A.—would hardly afford a basis for excusing Carrier from the consequences of its flagrant, though innocent, mistake. Finally, and most significant, it was, as we discuss next, Carrier's unmitigating fault which brought it all about.

### Indemnity Due Carrier on Free Port's Letter

It is ostensibly—but only ostensibly—odd that the party indemnified by the letter agreement ends up (i) not only losing that indemnity but (ii) indemnifying the indemnitor to boot. But there are several things either explicit or implicit in the Judge's findings which make the ostensible something else.

■ There is first the letter itself (see note 6 *supra*). No model of clarity it is a long way from that specificity which, under any rule, majority, minority, liberal or strict, holds an indemnitor to indemnify an indemnitee for the consequences of the indemnitees own negligence only if the purpose is plainly spelled out.[15] But while this would fully justify refusal to accord relief to Carrier against Free Port, by itself the vagueness of the contract could not turn the tables to grant affirmative relief to Free Port.

This brings us to the real basis—overwhelmingly substantiated in fact, equity and fair dealing—for the Judge's action.[16] The wisdom of this conclusion is probably best demonstrated by the specific contention urged by Carrier that despite Free Port's promise to do so it had not surrendered the original bill of lading within 30 days (see note 6, *supra*). But what "original bill of lading" had Free Port agreed to surrender? The original of Second Set—completely unknown to Carrier's agent who negotiated the indemnity letter? Or the original of the copy of First Set which was put into Free Port's hands by Carrier's agent and then tendered back to Carrier as a basis for delivery of the goods? What Carrier required to be surrendered within the 30 days was the original of the very bill of lading which the Cristobal office thought had, but in fact never had, been issued. There was a positive representation that the copy of First Issue was a copy of the true document. It was the original of First Issue, not Second Issue, which was the basis for Carrier's agreement to deliver against a copy reinforced by the indemnity which promised to surrender the original of a non-existent bill of lading.

■ There can be no question that it was the Carrier's fault, innocent but decisive, which set the whole stage and then involved all in the consequences of having delivered the goods to an unauthorized party. Had First Set copies not been sent to the Cristobal agency, or had copies of Second Set been properly distributed Free Port could not have even requested delivery to Perubras and had it done so Carrier would have declined

---

15. See United States v. Seckinger, 1970, 397 U.S. 1031, 90 S.Ct. 1255, 25 L.Ed. 2d 546, reversing, 5 Cir., 1969, 408 F.2d 146, 150–152; American Agricultural Chemical Co. v. Tampa Armature Works, Inc., 5 Cir., 1963, 315 F.2d 856, 860 (concurring opinion).

16. The Trial Court found:
"The Panama Free Port Corporation, although having signed the letter of indemnity in which it agreed to release the United Fruit Company 'from all claims and/or actions that may arise as a result of this release' and promising to deliver to the United Fruit Company 'original bills of lading within the next thirty (30) days', could not comply because of the mistake and negligence of the United Fruit Company itself. It was led to believe by the United Fruit Company that original bills were forthcoming to Perubras and relied upon this presentation to its detriment."

since under Second Set Shipper or his order was the only authorized consignee.

The indemnity against Carrier was amply supported.

### Excessive Damages

This leaves only Carrier's attack on the amount of damages fixed by the Court,[17] that element (A) value of the goods disregarded the market value test, and is in any event limited to the $500 per package provision of the bill of lading[18] and COGSA, 46 U.S.C.A. § 1304(5) and that element (B) is not recoverable in a transportation claim. As pointed out above (see note 14, *supra*), we doubt that this requires decision since all that is really open is Carrier's attack on the indemnity features. Nevertheless, for reasons briefly stated none of these complaints has merit enough to compel reversal or modification.

■■ On the approach taken by us we examine only attacks which Free Port could make. Assuming an attack is sufficiently open to Free Port to allow Carrier vicariously to assert it, Carrier can get no further than could Free Port. That knocks out its $500.00 per package limitation since this is a statutory/contractual limitation available only to a carrier as defined in COGSA and does not extend to stevedores or here, forwarders, service or warehouse persons. Herd & Co. v. Krawill Machinery Corp.,[19] 1959, 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed. 2d 820, 1959 A.M.C. 879.

■ Likewise, liability and hence damage responsibility of Free Port does not rest exclusively on the traditional market value as of the place of destination test. For non-transportation activities the Court was entitled, as it did, to look to local law[20] both as to the award for the undelivered goods (element (A) above) as well as the costs incurred by Shipper's agent in trying to find the goods (element (B) above). We cannot

| 17. (A) | Value of goods | | |
|---|---|---|---|
| | Sales Price | $24,189.94 | |
| | Less delivery expenses | 5,791.44 | |
| | | | $18,398.50 |
| (B) | Investigation Pursuit Expenses | | |
| | Air Fares | $ 1,109.44 | |
| | Per diem | 300.00 | |
| | | | $ 1,409.44 |
| | TOTAL | | $19,807.94 |

18. Clause 17 provides:
"Whenever the value of the goods is less than $500.00 per package or other freight unit their value in the calculation and adjustment of claims for which the carrier may be liable in any capacity shall, for the purpose of avoiding uncertainties and difficulties in fixing value, be deemed to be the invoice value, plus freight and insurance, if paid, irrespective of whether any other value is greater or less."

19. This expressly overruled our previous case, A. M. Collins & Co. v. Panama R. Co., 5 Cir., 1952, 197 F.2d 893, 1952 A.M.C. 2054.

20. Title 4 Section 4702 of the Canal Zone Code provides:
"The detriment caused by the wrongful conversion of personal property is presumed to be:
"(1) the value of the property at the time of the conversion, with the inter est from the time, or an amount sufficient to indemnify the party injured for the loss which is the natural, reasonable and proximate result of the wrongful act complained of and which a proper degree of prudence on his part would not have averted; and
"(2) a fair compensation for the time and money properly expended in pursuit of the property."

say that computing the value as he did, the Trial Judge improperly applied the local standard with which he is so familiar. Especially is this true since under transportation principles this was at least one of the roads looking to Rome's "market value." On this approach the wholesale value of the sandal straps was what a merchant in the Canal Zone area could obtain by a sale in the export market to Peru. A reconstruction of a market value along these lines is clearly permissible. Illinois Central R. Co. v. Crail, 1930, 281 U.S. 57, 50 S.Ct. 180, 74 L.Ed. 699. Great Atlantic & Pacific Tea Co. v. Atchison, T. & S. F. Ry. Co., 7 Cir., 1964, 333 F.2d 705, 708–709. After all, the law can be practical.

Although the route taken is different, in navigation, and hopefully the law, the Great Circle Course is the shortest and it leads here to an affirmance since Carrier cannot escape the burden of ultimately paying the full loss through Court imposed indemnity to Free Port.

Affirmed.

RONEY, Circuit Judge (dissenting):

I would reverse the judgment against United Fruit Company because the period of limitations in the bill of lading discharges the carrier from *all* liability in *any* capacity unless suit is brought within one year of delivery, which it was not, and the indemnity agreement taken by United Fruit Company from Panama Free Port Company controls the liability as between United Fruit and Free Port. Consent to the release of the goods without the surrender of the original bill of lading was requested by Free Port. United Fruit agreed only after receiving a written release "from all claims and/or actions that may arise as a result of this release." I do not know what more United Fruit could have done to protect against liability to Free Port and out-of-time liability to the shipper. There is no reason that the whole affair should not be controlled by the agreements of the parties.