MIAMI PARTS & SPRING, INC.,
Appellant,

v.

CHAMPION SPARK PLUG COMPANY,
Appellee.

No. 22420.

United States Court of Appeals
Fifth Circuit.

Aug. 3, 1966.

Robert C. Ward, Miami, Fla., Mortimer B. Wolf, New York City, for appellant, Ward & Ward, Miami, Fla., and Ross, Stamer, Wolf & Haft, New York City, of counsel.

Wm. A. Belt, Thos F. Butler, Toledo, Ohio, Earl D. Waldin, Jr., Miami, Fla., for appellee, Smathers & Thompson, Miami, Fla., and Marshall, Melhorn, Bloch & Belt, Toledo, Ohio, of counsel.

Before PHILLIPS,[*] JONES and BROWN, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge:

Miami Parts & Spring, Inc.,[1] a Florida corporation, brought this action against Champion Spark Plug Company,[2] a Delaware corporation, Harry F. Davis, Benjamin Weldon and Patten Sales Company of North Florida, Inc.,[3] a Florida corporation, to recover triple damages for alleged violations of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C.A. §§ 12–27, inclusive, and the Sherman Act, 15 U.S.C.A. §§ 1–7, inclusive. Champion is engaged in the manufacture, sale and distribution of spark plugs throughout the United States and in many foreign countries, and is the world's largest manufacturer of spark plugs. Commencing in 1937 and continuing until December 31, 1963, Miami was franchised by Champion as a distributor of Champion Spark Plugs in the Greater Miami Metropolitan Area. Champion refused to renew Miami's distributor's contract for the year 1964 and this action stems from that refusal and related facts set forth in Miami's amended complaint.

The trial court sustained a motion to dismiss the amended complaint and dismissed the action with prejudice on the grounds that: (1) Champion's alleged refusal to enter into a new distributor's agreement with Miami for the calendar year 1964 did not constitute a violation of the Sherman Act; (2) the allegations of the amended complaint did not set forth a violation of the Sherman Act by virtue of the Miller-Tydings Act, the McGuire Act, and the Florida fair trade law and public policy in effect in the State of Florida; and (3) the amended complaint failed to state a claim against Champion upon which relief could be granted.

From that order Miami has appealed.

In Liquor Store, Inc. v. Continental Distilling Corporation, Fla., 40 So.2d 371, decided April 5, 1949, the Supreme Court of Florida held that Chapter 541, F.S.A.1941, known as the "Florida fair trade law," derived from Laws 1939, c. 19201, was unconstitutional. Thereafter, the Florida legislature enacted a new Florida fair trade law, Laws 1949, c. 25204, Chapter 541, F.S.A.1949, with broader findings of fact and declarations

---

[*] Of the Tenth Circuit, sitting by designation.

[1.] Hereinafter called Miami.

[2.] Hereinafter called Champion.

[3.] Hereinafter called Patten.

of public policy, set forth in the first section thereof. Certain sections of the latter act were amended by Laws 1955, c. 29615. The provisions here pertinent of the 1949 act and the 1955 amendments thereof appear without substantial change in Chapter 541, F.S.A.1962.[4]

The findings of fact and declarations of policy made by the Florida legislature, set forth in Chapter 541, F.S.A. 1962, § 541.001 are set out in [5].

The provisions of the Florida fair trade law, here pertinent, read as follows:

"**541.01** *Short title*

"This chapter may be known and cited as the 'Florida fair trade law.'

4. The phrase "Florida fair trade law" when it hereinafter appears refers to Chapter 541, F.S.A.1962, unless the context shows otherwise.

5. "**541.001** *Findings of fact*

"(1) It is hereby found, determined and declared that the public interests and general welfare of the state will best be served by permitting the maintenance of minimum resale prices of trade-marked, branded or named commodities of a like kind and quality; and

"(2) It is found, determined and declared that without minimum resale price maintenance of trade-marked, branded and named commodities which are in free and open competition with commodities of the same general class, small retail merchants with limited purchasing power cannot survive the price wars or price cutting operations of large retail stores which, after forcing the small retailers out of business by such operations gain a virtual monopoly on the retail channels of commerce, contrary to the general welfare and public interest; and

"(3) It is hereby found, determined and declared that predatory cutting of established prices of trade-marked, branded or named products, as a deceptive means of unfairly luring from competitive merchants their customers, and for other purposes, has been the most potent weapon to which the great and destructive trusts have resorted most frequently, thereby to weaken and destroy their smaller competitors financially unable to endure resultant losses. By such misleading practice there is established in the trading area affected a virtual monopoly of distribution inter-

"**541.02** *Definitions*

"The following terms, as used in this chapter, are hereby defined as follows:

"(1) 'Commodity' means any subject of commerce.

"(2) 'Producer' means any * * * maker, manufacturer, * * *.

"(3) 'Wholesaler' means any person selling a commodity other than a producer or retailer.

"(4) 'Retailer' means any person selling a commodity to consumers for use.

\*  \*  \*  \*  \*  \*

posed between the producer and the public, by which the monopolist may extort at will from the consumer, while dictating prices and product quality dilutions to the producer, all contrary to the general welfare and public interest of the citizens of Florida; and

"(4) Such predatory price cutting is injurious to the general public as distinguished from a particular group or class thereof, and is also injurious to the good will and business of the producer and the distributor of commodities bearing a trade-mark, brand or identifying name; and

"(5) Prohibiting the unfair and discriminatory practice of price cutting of trade-marked, branded or named commodities which are in free and open competition with commodities of the same general class produced or distributed by others will foster and encourage free and honest competition and will safeguard the general public against the creation or perpetuation of monopolies; and

"(6) The public interest and general welfare of the state require the permissive or optional maintenance of minimum resale prices established in accordance with the provisions of this chapter by producers or distributors of trade-marked, branded or named commodities which are in free and open competition, as a permanent public policy of the state, at all times, including periods of deflation or inflation; and

"(7) This chapter is enacted as an exercise of the police power of this state, in order to serve the general welfare of the citizens of Florida, and with the further objective of preventing monopoly."

"541.03 *Contract may govern price of sale or resale*

"(1) No contract relating to the sale or resale of a commodity which bears, or the label or container of which bears, the trade-mark, brand, or name of the producer or distributor of such commodity and which commodity is in free and open competition with commodities of the same general class produced or distributed by others shall be deemed in violation of any law of the state by reason of any of the following provisions which may be contained in such contract:

"(a) That the buyer will not resell such commodity at less than the minimum price stipulated by the seller;

"(b) That the buyer will require of any dealer to whom he may resell such commodity an agreement that he will not, in turn, resell at less than the minimum price stipulated by the seller;

"(c) That the seller will not sell such commodity

"1. To any wholesaler, unless such wholesaler will agree not to resell the same to any retailer unless the retailer will in turn agree not to resell the same except to consumers for use and at not less than the stipulated minimum price, and such wholesaler will likewise agree not to resell the same to any other wholesaler unless such other wholesaler will make the same agreement with any wholesaler or retailer to whom he may resell; or

"2. To any retailer, unless the retailer will agree not to resell the same except to consumers for use and at not less than the stipulated minimum price.

\* \* \* \* \* \*

"541.07 *Suit at law for violation of chapter*

"Wilfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provisions of this chapter, whether the person so adver-tising, offering for sale or selling is or is not a party to such contract, and whether the particular lot of such commodity so advertised, offered for sale or sold was or was not at any time sold to a party to a contract that stipulated the price of such commodity under the provisions of this chapter is unfair competition and is actionable at the suit of any person damaged thereby."

The provisions of the 1949 Florida fair trade law, from which such pertinent sections quoted above were derived, were not substantially changed by the 1955 amendments. In fact, all of the changes made by the 1955 amendments were formal and made no substantial change in meaning.

The Miller-Tydings Act, 50 Stat. 693, 15 U.S.C.A. § 1, in part here pertinent, provides:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: *Provided,* That nothing contained in sections 1–7 of this title shall render illegal, contracts or agreements prescribing minimum prices for the resale of a commodity which bears, or the label or container of which bears, the trademark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others, when contracts or agreements of that description are lawful as applied to intrastate transactions, under any statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia in which such resale is to be made, or to which the commodity is to be transported for such resale, and the making of such contracts or agreements shall not be an unfair method of competition under section 45 of this title: *Provided further,* That the preceding proviso shall not make lawful any contract or

agreement, providing for the establishment or maintenance of minimum resale prices on any commodity herein involved, between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms, or corporations in competition with each other. * *."

The McGuire Act, 66 Stat. 632, 15 U.S.C.A. § 45, in part here pertinent, provides:

"(2) Nothing contained in this section or in any of the Antitrust Acts shall render unlawful any contracts or agreements prescribing minimum or stipulated prices, or requiring a vendee to enter into contracts or agreements prescribing minimum or stipulated prices, for the resale of a commodity which bears, or the label or container of which bears, the trademark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others, when contracts or agreements of that description are lawful as applied to intrastate transactions under any statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia in which such resale is to be made, or to which the commodity is to be transported for such resale.

"(3) Nothing contained in this section or in any of the Antitrust Acts shall render unlawful the exercise or the enforcement of any right or right of action created by any statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia, which in substance provides that willfully and knowingly advertising, offering for sale, or selling any commodity at less than the price or prices prescribed in such contracts or agreements whether the person so advertising, offering for sale, or selling is or is not a party to such a contract or agreement, is unfair competition and is actionable at the suit of any person damaged thereby.

\* \* \* \* \* \*

"(5) Nothing contained in paragraph (2) of this subsection shall make lawful contracts or agreements providing for the establishment or maintenance of minimum or stipulated resale prices on any commodity referred to in paragraph (2) of this subsection, between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms or corporations in competition with each other."

In its amended complaint Miami set out the facts stated above, and further alleged these facts.

In addition to spark plugs, Champion also manufactures, sells and distributes spark plug testing, cleaning and repair equipment, gap-setting tools, abrasives, cable terminals, and a variety of similar products for automotive and aircraft engines. Champion sells and ships its products in commerce among the various states of the United States and the District of Columbia and in foreign countries.

Within the United States Champion markets its spark plugs through approximately 800 distributors, who have more than 900 branches. Such distributors resell to approximately 17,000 jobbers. Champion Spark Plugs are sold at retail by between "300,000 and 400,000" service stations and other dealers in the United States and are utilized by approximately 4,700 operators of motor vehicle fleets that buy such spark plugs for their own use. It has approximately 100 distributors in Canada and some 400 distributors in overseas markets. The trade-mark "Champion" is universally known in the automotive parts trade and is well known to the consuming public. Champion and its wholly owned corporate subsidiaries own and operate plants in Toledo and Cambridge, Ohio; Detroit, Michigan; Hellertown, Pennsylvania; Burlington, Iowa; Windsor, Ontario, and Feltham, England, and at

various points in Australia, Brazil, Ireland, Mexico, and South Africa.

Miami is and was at all times here pertinent a wholesale warehouse distributor of automotive replacement parts. During the year 1963, it regularly sold and distributed automotive parts to approximately 150 jobbers in the Greater Miami Metropolitan Area in Florida.

Commencing in 1937 and continuing until December 31, 1963, Miami was annually franchised by Champion as a distributor of Champion Spark Plugs in the Greater Miami Metropolitan Area. During that period Miami bought such spark plugs from Champion, carried them as an essential part of its regular stock in trade, did not buy or sell any other brand of spark plugs, and was wholly reliant upon Champion for the large and continuous supply of spark plugs necessary to carry on its business and supply its customers. Champion, in various ways, induced and encouraged such reliance by Miami.

Annexed to the amended complaint and made a part thereof is a copy of the 1963 Champion Distributor's Agreement with Miami. Such agreement provided that Miami warranted that it was able and willing to maintain at all times a stock of Champion products sufficient to serve the requirements of jobbers, dealers and fleet operators in Miami's marketing area and to maintain a sales force to service the trade and promote the sale, distribution and service of Champion Spark Plugs. It further provided for a functional allowance amounting to 7 per cent of the billing price on Champion Spark Plugs, spark plug components, service units, service items, and replacement parts, except aviation spark plugs, for Miami's effectively carrying out the respective marketing programs and policies of Champion, as set forth in the agreement, and adequately supplying and serving Miami's branches, dealers, and fleet operators. It provided for a warehouse allowance of 11 per cent, computed as provided in the agreement, in consideration of Miami's carefully selecting and properly servicing its jobber basis and "C" fleet customers and the maintenance of a sufficient inventory to supply their requirements of Champion Spark Plugs. It further provided that such warehouse allowance should apply only to resales by Miami to jobber basis customers, who are independent wholesalers, and to "C" fleet operators. It further provided: "In order to give all resellers and the consuming public the advantages afforded by the Fair Trade laws, we shall enter into Fair Trade Agreements in all states having Fair Trade laws."

On December 18, 1963, Champion and Miami entered into a Distributor Fair Trade Agreement. Such agreement recited that:

"Champion Spark Plugs now or hereafter made subject to this agreement are and will be distributed under the Champion trade mark in free, fair and open competition with commodities of the same general class produced by others. Champion and the Buyer desire to avail themselves of the Fair Trade Law in said state, (Florida) and desire that in accordance therewith Champion Spark Plugs shall be sold at wholesale to dealers, 'A' Fleet operators and 'B' Fleet operators in said state at not less than the minimum prices applicable thereto as herein provided."

It provided that the term "Dealer" used therein should not include any purchaser who bought on the "Jobber Basis" and that the term "fleet operator" should not include any purchaser who brought on the "C" Fleet Basis, but referred to an operator of a fleet of motor vehicles purchasing spark plugs for use in its own equipment only, and not for resale; that except as specifically permitted by the Fair Trade Act of Florida, Miami would not advertise, offer for sale, or sell Champion Spark Plugs to any dealer or "A" Fleet operator for less than the prices stipulated for the quantity sold in Column One, or to any "B" Fleet operator for less than the prices stipulated in Column Two, of the schedule attached to the agreement.

Champion also undertook to control jobber and retail prices by fair trade agreements, entered into with resellers, wherein the reseller agreed not to sell Champion Spark Plugs at less than the minimum prices fixed in the schedule attached to such fair trade agreements.

During 1963 and for a number of years prior thereto, Miami accounted for the sale of a minimum of 50 per cent of the Champion Spark Plugs sold to jobbers in the Greater Miami Metropolitan Area and such sales amounted to $275,000 per year.

At all times mentioned in the amended complaint prior to December 31, 1963, Miami, as a franchised distributor of Champion Spark Plugs, was entitled to and did purchase large quantities of such spark plugs from Champion at prices listed on the Distributor Cost Sheets issued each year by Champion, less the 7 per cent and 11 per cent allowances for discounts mentioned above.

In order to receive such 11 per cent allowance, Miami was required to report to Champion no later than the tenth day of each month the identities of its jobber customers and the quantities of spark plugs sold by Miami to each of them during the previous month. The form upon which such reports were required to be made provided for the setting forth of the dollar value of spark plugs and miscellaneous items sold to such jobbers.

Champion's plan and method of distributing Champion Spark Plugs at all times mentioned in the amended complaint consisted of sales by Champion to franchised distributors, who, in turn, resold such spark plugs to so-called "jobber basis" customers approved by Champion and the resale of such spark plugs by such jobbers to retail dealers, who resold them to the consuming public.

At all times mentioned in the amended complaint, Champion attempted to prescribe the resale price of Champion Spark Plugs by distributors, jobbers and retailers through suggested price lists and like material issued by Champion, and by requiring distributors, jobbers and retailers, respectively, of Champion Spark Plugs to agree to observe the suggested resale prices prescribed by Champion in states having fair trade laws by entering into Distributor Fair Trade Agreements and Reseller Fair Trade Agreements. Champion represented that such agreements were binding only in states having fair trade laws, but in fact it sought to enforce such minimum resale prices everywhere and at all levels of its distributions system by coercive and illegal means.

To enforce its suggested resale prices of Champion Spark Plugs, Champion took legal action under state fair trade laws in those states where effective fair trade laws existed.

Miami, in its amended complaint, alleged as a conclusion of law, rather than a statement of fact, that effective fair trade laws did not exist in Florida; and further alleged the following facts: In Florida and other states where fair trade laws or effective fair trade laws did not exist, Champion embarked upon an extralegal and illegal campaign of coercion, the blacklisting and boycotting of price cutters and of jobbers who were suspected of supplying Champion Spark Plugs to discount houses and wagon peddlers,[6] and of surveillance, espionage and other forms of intimidation to compel adherence to its suggested prices. By so doing, Champion enlisted and gained its distributors' and jobbers' participation in a program to effectuate retailers' adherence to Champion's suggested retail prices and thereby created unlawful combinations and entered into conspiracies to suppress price competition at all levels of its distribution system.

In furtherance of such price fixing plan, combination and conspiracy, Champion took action intended to reduce or eliminate the source of supply of Champion Spark Plugs to discount houses and wagon peddlers in the Greater Miami Metropolitan Area.

6. Discount houses and wagon peddlers consistently disregard suggested retail price lists and sell at cut prices.

By threats and coercion, Champion sought to cause Miami to cease selling spark plugs to jobbers who resold them to discount stores or wagon peddlers; accused Miami of selling Champion Spark Plugs to price cutters and undesirable accounts, of selling spark plugs to jobbers at less than Champion's suggested jobber-level prices and of being a price cutter; and warned Miami that unless it complied fully with Champion's plans and schemes to control the identities of Miami's jobber customers and the identities of the retailers to whom such jobber customers resold Champion Spark Plugs and the prices of such sales and resales, Miami's status as a distributor of Champion's products would be in jeopardy. Champion also received and encouraged complaints against Miami by other distributors with respect to price cutting and the sale of Champion Spark Plugs to jobbers who were suspected to be the source of supply to discount houses and wagon peddlers; caused Miami's employees and employees of distributors and jobbers of Champion Spark Plugs to keep Miami under surveillance and inform upon and report to Champion instances in which Miami "violated" Champion's "unlawful policies and prices"; procured William Schmeling, who was employed by Miami as its vice-president and general manager until April, 1963, to reveal to Champion instances in which Miami had departed from Champion's suggested resale prices and received from Schmeling papers illegally and without authorization removed from Miami's files, constituting alleged proof of price cutting by Miami; received from Schmeling papers and records, which Schmeling, after having been discharged by Miami, subverted other employees of Miami to remove from Miami's files without authorization; repeatedly commented unfavorably upon Miami's sales of large quantities of Champion Spark Plugs to Paramount Distributors, Inc., a jobber whom Champion accused of reselling to discount houses, and sought to cause Miami to boycott Paramount and cut off its source of supply of Champion Spark Plugs; refused to renew Miami's distributorship of Champion products from and after December 31, 1963, on the ground that Miami had failed to adhere to Champion's price fixing plan, combination and conspiracy; and informed customers of Miami and caused and encouraged employees of Champion's distributors in the Miami area to inform customers of Miami that Miami had been discontinued as a distributor to "clean up the market" and to control the sale of Champion Spark Plugs to discount houses and wagon peddlers.

The plan, policy and program sought to be carried out by Champion contemplated participation therein and conformance therewith by all distributors of Champion Spark Plugs, to be made effective by the elimination of any distributor who refused to participate therein and conform therewith; and the principal purpose and effect of such combination and conspiracy was to control, prevent, lessen and restrain lawful competition by and between competing distributors, competing jobbers and competing retailers in the sale of Champion Spark Plugs and thereby restrain and burden trade and commerce among the several states.

Champion first notified Miami of the revocation or termination of its franchise on December 20, 1963, when it had theretofore actively misled Miami to believe that such distributorship would continue through 1964; Champion lured the larger of Miami's regular customers away from it and induced them to purchase their respective requirements of Champion Spark Plugs directly from Champion by offering to allow them the discounts which it had been allowing to Miami; and in January, 1964, Champion, through its authorized representative, visited various spark plug customers of Miami, accompanied by salesmen employed by Patten Sales Company of Miami, Inc., which prior to December 31, 1963, was Miami's principal competitor, and endeavored to cause such former

customers of Miami to transfer their accounts to Patten.

In its amended complaint, Miami further alleged that as a result of such acts it had been damaged in the sum of $750,000.

In Miles Laboratories, Inc. v. Eckerd, Fla., 73 So.2d 680 (March 16, 1954), the Supreme Court of Florida held that the nonsigner provision of the Florida fair trade law (§ 541.07, supra) was an invalid exercise of the police power and contravened the constitution of Florida.

At the threshold of this case, we are confronted with the question of whether the remainder of the fair trade law contravenes the constitution of Florida.

In the case of Sunbeam Corporation v. Chase & Sherman, Inc., the Circuit Court of Dade County, Florida, in passing on the application of Sunbeam for a temporary restraining order against Chase & Sherman, Inc., gave exhaustive consideration in a written opinion (Circ. Ct. Dade County, CCH Trade Cases ¶ 67,524, c. d., Fla., 73 So.2d 714) to the constitutionality of the Florida fair trade law enacted in 1949 (Laws 1949, c. 25204) other than the nonsigner section, held it to be valid under the Florida constitution, and granted the temporary injunction sought.

Chase & Sherman, Inc., filed in the Supreme Court of Florida a petition for certiorari under Rule 34,[7] of the Rules

of Practice of the Supreme Court of Florida, 31 F.S.A.

The Supreme Court of Florida has made it clear that certiorari under Rule 34, commonly called "rule certiorari," differs substantially from constitutional certiorari in Florida and statutory certiorari in the Federal court system, particularly with reference to the effect of a denial of the petition for the writ.

In Hunter v. Tyner, 151 Fla. 707, 10 So.2d 492 (Nov. 10, 1942) Hunter filed a bill of complaint in chancery against Tyner and two other defendants, charging them with the commission of a fraud in the sale of certain property. Upon motion of solicitor for the defendants, the court ordered the cause transferred from chancery to common law. In its opinion, the court said:

" * * * This action was reviewed by us on petition for writ of certiorari which was denied.

\* \* \* \* \* \*

"We revert to the first question presenting the appellant's contention that there was equity in the amended bill of complaint and charging that the court erred in transferring the cause from the chancery to the common-law court. This matter will not be considered again in this appeal because, as we have stated at the outset, the court's ruling was examined upon the application for certiorari under Rule

---

7. The author of an article in 4 University of Florida Law Review, pp. 447–448, after adverting to the fact that a denial of certiorari by the Supreme Court of the United States carries no implication concerning the merits of the case, said:

"At the other extreme is certiorari under Rule 34 of the Rules of Practice of the Supreme Court of Florida, which is not certiorari at all but rather a sadly mis-named method of taking, on the equity side, ' * * * appeals from interlocutory decrees as authorized by statute including orders or decrees after final decree * * *.' It lies as of right; no writ actually issues; and denial of this 'certiorari' is a definite affirmance of the interlocutory decree under attack rather than a mere refusal to consider it."

In another article in 4 University of Florida Law Review, pp. 529–531, the author said:

" * * * when an interlocutory order in equity is appealed to the Florida Supreme Court under Rule 34, the merits are presented by the petition and supporting brief, and controverted in the brief of respondent; the case is orally argued on the merits; and what the Court takes under consideration for determination is the merits of the order reviewed. No question is presented or considered as to whether or not the Court will later hear the merits; the Court actually hears the merits; and when it rules, of necessity it decides the merits."

34 of this court and the petition was denied. That rule was adopted to expedite and simplify reviews of interlocutory orders and it has proven of great benefit in speedily determining meritorious challenges of preliminary decisions and in discouraging appeals lacking merit or brought for the purpose of delay. *Incidentally, we may say that the intermediate decision in this controversy was decided on its merits.* A writ of this kind being simply a method of procedure by which such appeals authorized by the statute can be brought to this court, its denial, we think, was an adjudication of the propriety of the order involved and it could not again be questioned in this appeal. * * *" (Italics ours.)

The last sentence in the above quotation was reiterated with express approval in Hamel v. Danko, Fla., 82 So.2d 321 (Sept. 14, 1955).

In Davis v. Strople, Fla., 39 So.2d 468 (March 11, 1949), the court said:

"We have here an appeal from a final decree quieting title. The sufficiency of the bill was before us in Davis v. Strople, 158 Fla. 614, 29 So. 2d 364, where we denied certiorari under Rule 34. * * *

"We are now asked to re-examine the bill and also to hold the evidence insufficient to sustain the decree. By reason of our previous decisions we will not now, a second time, consider whether the bill is sufficient. See Hunter v. Tyner, 151 Fla. 707, 10 So. 2d 492; Hager v. Butler, 156 Fla. 113, 22 So.2d 631."

Davis v. Strople, supra, was heard en banc. One judge dissented. It is significant that the dissenting judge took the position that certiorari under Rule 34 was not a writ of right and rested in the sound discretion of the court, and that its denial should not be regarded as a determination of the merits of the question presented by the petition for the writ.

In Hamel v. Danko, supra, the court held that denial of certiorari under Rule 34 to review certain orders made in an equity action for dissolution of a corporation and partition of its assets established the law of the case on those issues.

Finally, in Advertects, Inc. v. Sawyer Industries, Fla., 64 So.2d 300 (April 10, 1953), the court held that the denial of a petition for the review of an order by a writ of certiorari under Rule 34 was an affirmance of the order. In the opinion the court said:

"* * * The order appointing the receiver was reviewed by this Court on a petition for writ of certiorari and this Court affirmed the order of the Chancellor by denying the petition for writ of certiorari. See Sawyer Industries, Inc. v. Advertects, Inc., Fla., 53 So.2d 671. * * *." [8]

We are not unmindful that Chief Judge Tuttle in Sunbeam Corporation v. Masters of Miami, Inc., 5 Cir., 225 F.2d 191, in effect said that the denial of certiorari in Sunbeam Corporation v. Chase & Sherman, supra, like a denial of certiorari by the United States Supreme Court, carried no implication concerning the merits of the case, and that the Federal court was not required to regard the circuit court decision in the *Chase & Sherman* case as the law of Florida, with respect to the validity of fair trade contracts between the parties. But that statement was pure dictum. That is clearly shown by the following statement in the opinion:

"* * * We think it may well be that Fair Trade contracts are unenforceable in Florida even between the parties; however, it will be seen that this is unnecessary to our decision here, and we do not decide that question. For reasons stated infra, we think the Chase & Sherman decision does not have any important bearing

---

8. See also Judge Rives's dissent in Sunbeam Corporation v. Masters of Miami, Inc., 5 Cir., 225 F.2d 191, at 201–202.

on the issue we are called upon to decide."

Because we regard the statement with respect to the denial of certiorari in Sunbeam Corporation v. Masters of Miami, supra, as dictum and because we are of the opinion that it is contrary to the holdings of the Supreme Court of Florida, we do not feel constrained to follow it.

█ Accordingly, we conclude that we should follow the decision of the Dade County Circuit Court, affirmed by the Supreme Court of Florida, and hold that the Florida fair trade law, other than the nonsigner provision, is constitutional and valid.

The question remains whether, although the Florida fair trade law, other than the nonsigner clause, is constitutional, the amended complaint states a claim upon which relief can be granted.

█ The test of the sufficiency of a complaint is whether it appears to a certainty that the plaintiff can possibly be entitled to relief under any set of facts which could be proved in support of the allegations of the complaint.[9]

Here, the fair trade agreement between Champion and Miami did not provide, as it might have under the Florida fair trade law "that the buyer (Miami) will require of any dealer to whom he may resell" Champion Spark Plugs "an agreement that he will not, in turn, resell at less than the minimum price stipulated by the seller (Champion)"; or that Miami would not sell Champion Spark Plugs "to any wholesaler, unless such wholesaler will agree not to resell the same to any retailer unless the retailer will in turn agree not to resell the same except to consumers for use and at not less than the stipulated minimum price."

The amended complaint does not admit that Miami sold Champion Spark Plugs to any jobber, fleet operator, or any dealer at less than the minimum price stipulated by Champion, or in any other way violated either its Distributor's Agreement or its Fair Trade Agreement with Champion.

█ The Supreme Court of Florida has squarely held that a "nonsigner" is not liable for selling any commodity at less than the price stipulated in any contract entered into pursuant to the provisions of the Florida fair trade law, because to impose such liability would sanction anti-competitive price fixing, contrary to the traditional concepts of free enterprise that afford protection to the consuming public.[10] And in Sunbeam Corporation v. Masters of Miami, Inc., supra, this court held that an action would not lie by Sunbeam, a manufacturer of electrical appliances against Masters, a Florida corporation, engaged in the sale of electrical appliances in Florida, for an injunction and damages, on the ground that Masters had interfered with fair trade agreements between Sunbeam and distributors and retailers of Sunbeam products by inducing them to sell such products to Masters in violation of such fair trade agreements. The theory of the action was that Masters was guilty of the tort of inducing signers of fair trade agreements to breach such agreements. The court said:

"* * * Preventing nonsigners from buying goods diminishes the scope of competition just as surely as preventing them from selling below list prices, though it is true that it is a more indirect way of accomplishing that object * * *.

*  *  *  *  *  *

"* * * To reverse the judgment in the present case would be to refuse to apply the public policy of Florida as it has most recently been declared by its Supreme Court, * * *. Miles Laboratories v. Eckerd, supra. * *."

9. Sunbeam Corporation v. Masters of Miami, Inc., supra, at 193; John Walker & Sons v. Tampa Cigar Co., 5 Cir., 197 F.2d 72, 73; Byrd v. Bates, 5 Cir., 220 F.2d 480, 482.

10. Miles Laboratories, Inc. v. Eckerd, Fla., 73 So.2d 680, 682.

■ There is respectable authority for the proposition that a conspiracy to terminate a distributorship and appoint a new distributor is not *per se* a violation of the Sherman Act. See Ace Beer Distributors, Inc. v. Kohn, Inc., 6 Cir., 318 F.2d 283, c. d. 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166.[11] In that case the object of the conspiracy was the termination of plaintiff's distributorship, and as an incident thereto, the proselyting of plaintiff's employees. The court pointed out that the substitution of one distributor for another "does not eliminate or materially diminish the existing competition" and is not an unreasonable restraint of trade. But here, it appears from the allegations of the amended complaint that what Champion and the persons who joined with it were undertaking to accomplish was to cut off the source of supply of Champion Spark Plugs to discount houses and peddlers who sold Champion Spark Plugs at less than Champion's suggested retail prices. And if the object of the alleged conspiracy here was to eliminate the competition of discount houses and peddlers by cutting off their source of supply, and to eliminate jobbers of Champion Spark Plugs in the Miami Area who would not refuse to sell to such discount houses and peddlers by eliminating Miami as a distributor when it would not refuse to sell to jobbers who sold to discount houses and peddlers, and appointing a new distributor that would refuse to sell to jobbers who sold Champion Spark Plugs to discount houses and peddlers, then it would seem that there was an unlawful conspiracy under the Sherman Act, under the recent holding of the United States Supreme Court in United States v. General Motors Corporation, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed. 415,[12] unless the alleged unlawful agreement between Champion and the other parties thereto was made lawful by the laws or public policy of Florida and the provisions of the Miller-Tydings and the McGuire Acts.

We think it cannot be said to a certainty that Miami cannot possibly be entitled to any relief under any set of facts which could be proved in support of the allegations of the complaint. Hence, we conclude the case should not have been disposed of on the allegations of the amended complaint. Rather, we think Champion should be required to answer and set up its defenses and the District Court, in the light of our opinion, the decision of the Supreme Court of Florida in Miles Laboratories v. Eckerd, supra, the decision of this circuit in Sunbeam Corporation v. Masters of Miami, supra, and the decision of the United States Supreme Court in United States v. General Motors Corporation, supra, and after the pertinent facts have been determined by discovery, pretrial, and the trial of any remaining contested issues of fact, should determine the issues of law presented.

Reversed and remanded, with instructions to vacate the order dismissing the action with prejudice and to proceed further in accordance with the views herein expressed.

11. See also *Feddersen Motors, Inc. v. Ward*, 10 Cir., 180 F.2d 519, 522; Shotkin v. General Electric Co., 10 Cir., 171 F.2d 236, 239; Perryton Wholesale, Inc. v. Pioneer Distributing Company of Kansas, 10 Cir., 353 F.2d 618, 621, 622.

12. In the opinion in the *General Motors* case the court said:
"There can be no doubt that the effect of the combination or conspiracy here was to restrain trade and commerce within the meaning of the Sherman Act. Elimination, by joint collaborative action, of discounters from access to the market is a per se violation of the Act."