**UNITED STATES of America,
Appellant,**

**v.**

**M. O. SECKINGER, Jr., t/a M. O.
Seckinger Company, Appellee.**

**No. 23432.**

United States Court of Appeals
Fifth Circuit.

Feb. 28, 1969.

Morton Hollander, William Kanter, Attys., Dept. of Justice, Washington, D. C., for appellant.

John G. Kennedy, Savannah, Ga., for appellee.

Before JOHN R. BROWN, Chief Judge, and GOLDBERG and AINSWORTH, Circuit Judges.

JOHN R. BROWN, Chief Judge:

This case began sounding in tort but through a simple twistification, General Guaranty Ins. Co. v. Parkerson, 5 Cir., 1966, 369 F.2d 821, of the Federal impleader rule, F.R.Civ.P. 14(a), plus a prior final judgment, it is now here after several dismissals for failure to state a claim, for a decision on the propriety of the most recent dismissal. We are called upon like many times in the past,[1] to determine if a contract [2] calls for indemnity

---

1. American Agricultural Chemical Co. v. Tampa Armature Works, 5 Cir., 1963, 315 F.2d 856; Jacksonville Terminal Co. v. Railway Express Agency, 5 Cir., 1961, 296 F.2d 256; Travelers Ins. Co. v. Busy Electric Co., 5 Cir., 1961, 294 F.2d 139; Batson-Cook Co. v. Industrial Steel Erectors, Inc., 5 Cir., 1958, 257 F.2d 410.

2. *The contract in this case provides:*
   "He [Seckinger] shall be responsible for all damages to persons or property that occur as a result of his fault or negligence in connection with the prosecution of the work."

or is merely a simple responsibility clause. This case would be one of a simple nature except for two factors: first, in a prior suit, the indemnitee has been found negligent, and we must decide if this bars his recovery, and second, another wrinkle, Mike Hooks, Inc. v. Pena, 5 Cir., 1963, 313 F.2d 696, 1963 A.M.C. 355, is that the United States is a primary party to the contract. We are not here dealing with merely a contract entered into between two private parties. Rather we are confronted with a contract having direct and significant public interest. Cf. J. M. Huber Corp. v. Denman, 5 Cir., 1966, 367 F.2d 104.

The facts can be severely capsulated.[3] In 1956, Claimant, an employee of Contractor, was injured when he came into contact with a high voltage wire while working on a pipe job that Contractor was performing at the Paris Island Marine Depot, South Carolina. Claimant filed an FTCA suit, 28 U.S.C.A. § 1346 (b) (1964), against the Government in South Carolina, for negligence in not deenergizing the wire and for not warning the workers of the danger involved. The Government filed a third-party claim[4] against Contractor alleging that Claimant's injuries were caused by Contractor's negligence, and asking for recovery against Contractor for all sums recovered by Claimant from it. Contractor, contending that the Government's third-party claim failed to state a claim upon which relief could be granted, moved to dismiss. The motion was granted.[5] Thereupon the suit by Claimant against the Government went to trial in the District Court in South Carolina. The Government was found negligent and Claimant awarded $45,000.

Thereafter the Government instituted the present suit against Contractor in the Southern District of Georgia asserting that Contractor's negligence caused Claimant's injuries, and that under the express terms of the contract between the parties (see note 2, *supra*), Contractor was required to indemnify the Government. Contractor's motion to dismiss this complaint was granted. The Court had a double-barrelled basis for its dismissal. The first was that this suit was barred by res judicata since the Government had not appealed from the prior dis-

---

3. Claimant:
   Ernest E. Branham, injured employee of Contractor who initiated the suit and recovered a judgment against the Government.

   Contractor:
   M. O. Seckinger Company, employer of Claimant and the appellee-indemnitor in this appeal.

   Government:
   United States Government, owner for whom work was being performed by Contractor and now the appellant-in-demnitee.

   Claimant is not a party to this appeal by the Government.

4. The Government brought this third-party claim against Contractor pursuant to F. R.Civ.P. 14(a) which provides:
   "*When Defendant May Bring in Third Party.* At any time after commencement of the action a defending party, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action who is or may be liable to him for all or part of the plaintiff's claim against him."

5. In granting the motion on July 17, 1961, the Judge's order stated:
   "After hearing the arguments of counsel, I am of the opinion that the controversy between the [Government] Third-Party Plaintiff, and [Contractor] Third-Party Defendant, should not be resolved at this time and further that its inclusion in the trial of the dispute between [Claimant] and [Government] would unnecessarily and improperly complicate the issues * * *. I therefore order that the * * * complaint of the United States be dismissed with leave * * * to the United States * * * to take such further action at an appropriate time * * *."
   Not because we have inherited an appeal which otherwise would have gone to the Fourth Circuit, we think subsequent events prove that nothing was to be gained by truncating the case. Since all claims were for determination by the Judge without a jury under FTCA, the complications, if any, were readily controllable. There are many ways to handle varying issues, burdens of proof, etc., in impleader, cross-claim situations. See United States Lines Co. v. Williams, 5 Cir., 1966, 365 F.2d 332, 336 n. 11, 1966 A.M.C. 2418, 2424 n. 11.

missal of its impleader claim. The second was that a mere examination of the contract showed that it is not one which would allow the Government, who had been found negligent in a prior trial, to recover its losses from Contractor. This appeal followed.

■ The prior dismissal of the Government's claim (see note 5, *supra*) was without prejudice to refiling. We hold that dismissal on the ground of res judicata was erroneous since the Trial Court expressly left it open for the Government to pursue its claim at a later date.

■■ The question at the outset is what law is to govern, State (South Carolina) or Federal? We think the simple answer is that Federal law must control.[6] The first and certainly one of the leading cases in this area is Clearfield Trust Co. v. United States, 1943, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838. There the Court held that "[t]he application of state law * * * would subject the rights and duties of the United States to exceptional uncertainty." 318 U.S. at 367, 63 S.Ct. at 575, 87 L.Ed. at 842. There is obviously a need for uniformity in results relative to claims presented by the United States to the Federal Courts for solution.[7] As the discussion on the ultimate merits reveals, there is more than enough difficulty in trying to synthesize a rule that could safely be followed by a multistate corporate business enterprise in determining the construction and enforceability of indemnity contracts without imposing the same uncertainty and burden on the national sovereign in its undertaking to have contractors perform essential work within its wide sphere of governmental responsibilities. Anything having such a direct touch upon the national treasury should likewise be resolved on standards having like national uniformity. But to conclude that it is Federal law, not State (South Carolina) law, that governs, is no solution. It merely states the problem for there is no clearly defined Federal law, which means that with divergent views in the 50 states, we must make the choice.

■ At the outset the Government seeks to escape from the necessity of any choice and certainly the prospect of our adopting, as a Federal rule, the majority rule. It does this by asserting that its agreement with Contractor is not one for indemnity at all, whether indemnity based upon the Government's negligence as indemnitee or the indemnitor-Contractor's negligence, or a mixture of both. It insists that the engagement is a simple but direct one of putting responsibility on Contractor for all damages to property or persons, although its manner of statement and the absence of the classic terminology of indemnity might well have a bearing upon how it is to be construed and applied. We think this is a much too literal, unrealistic approach. If the Government is right on the construction of it, then in its operative effect it will afford to the Government all of the advantages of an indemnity and will impose on Contractor all of the correlative disadvantages. Thus the stage is set for a determination of the significance negligence on the part of the indemnitee should have. For a while this case suffers from all of the uncertainties of a swift and unilluminating disposition on bare bones pleadings.[8]

6. 41 Am.Jur.2d Indemnity § 5, at 691 (1968).

"Federal case law is controlling as to the right of the Federal Government to indemnification under an indemnity contract into which it has entered, and such a contract is not repugnant to the Federal Tort Claims Act or contrary to public policy."

7. Cf. Petty v. Tennessee-Missouri Bridge Comm'n, 1959, 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804; United States v. Jones, 9 Cir., 1949, 176 F.2d 278. *See* Free v. Bland, 1962, 369 U.S. 663, 82 S. Ct. 1089, 8 L.Ed.2d 180; Royal Indemnity Co. v. United States, 1941, 313 U.S. 289, 61 S.Ct. 995, 85 L.Ed. 1361; Security Life & Accident Ins. Co. v. United States, 5 Cir., 1966, 357 F.2d 145.

8. As we recently said in Barber v. Motor Vessel "Blue Cat," 5 Cir., 1967, 372 F.2d 626, "at this day and time dismissal of a claim—landbased, waterborne, amphibious, equitable, legal, maritime, or an

The very assertion of the case by the Government inevitably casts it in the role of a negligent actor. The Government's claim against Contractor rests on the fact that it has had to pay substantial sums to Claimant and this was the direct result of a finding of negligence on its part. Its allegation that Contractor was negligent and that this negligence of the Contractor, not that of the Government, was the real proximate cause of Claimant's injuries does not save the day. It simply precipitates the problem of whether this contract (see note 2, *supra*) imposes on Contractor the burden of absorbing all of the loss brought about by active negligence of the indemnitee if, in some appreciable way, negligence even though slight, of the indemnitor contributed to the damage.

■■ That question is essentially one of contract construction, but a construction viewed from the standpoint of the parties, their relative freedom of action and real bargaining strength and the principles of construction imposed by the pertinent law (State or Federal) concerning the liberality or strictness with which such agreements are to be read. For we would certainly not consider for a moment in fashioning Federal law, that a contract to indemnify one against the consequences of the indemnitee's own negligence is contrary to public policy and thus void altogether, even though there is some division among the courts.[9]

In approaching this as a question of law, really choice of law, governing Federal contracts and contractual relationships with governmental contractors, we think everything points toward the desirability of seeking not only a uniformity for the national sovereign but doing that in a way which will more or less simultaneously effect a uniformity with local law. The easiest way to achieve that is to declare that the Federal interest will best be served by choosing the majority rule. Of course, to choose the law is not to eliminate uncertainty or difficulty or the possibility of variable results. But it will lay a standard concerning the approach which the reviewing court is to have and those principles which the court may properly regard to be the performance of acceptable judicial functions and prerogatives.

The majority rule has been variously stated. 41 Am.Jur.2d Indemnity § 15, at 701 (1968): "[A]n overwhelming majority of jurisdictions adhere to the general rule requiring an unequivocal expression of intent before allowing indemnity for the indemnitee's own negligence * * *."

Although this court in *Jacksonville Terminal*[10] rejected the "majority rule"

---

ambiguous, amphibious mixture of all of them * * * on the basis of the barebone pleadings is a precarious one with a high mortality rate." *Id.* at 627. The test for a dismissal without a fact finding, articulated in Conley v. Gibson, 1957, 355 U.S. 41, 78 S.Ct. 99, 2 L. Ed.2d 80, is "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. at 45–46, 78 S.Ct. at 102, 2 L.Ed.2d at 84. This brings us to the asserted facts of the claim and the terms of the contract.

9. Some jurisdictions hold such a contract void ab initio as against public policy. Woodbury v. Post, 1893, 158 Mass. 140, 33 N.E. 86; Sternaman v. Metropolitan Life Ins. Co., 1902, 170 N.Y. 13, 62 N.E. 763, 57 L.R.A. 318. Other courts hold that such contracts are not void, cf. National Surety Corp. v. Rauscher, Pierce & Co., 5 Cir., 1966, 369 F.2d 572, 577. 41 Am.Jur.2d Indemnity § 9, at 694 (1968): "[I]t is now the prevailing rule that a contract may validly provide for the indemnification of one against, or relieve him from liability for, his own future acts of negligence provided the indemnity against such negligence is made unequivocally clear in the contract."

10. Jacksonville Terminal Co. v. Railway Express Agency Inc., 5 Cir., 1961, 296 F.2d 256, cert. denied, 369 U.S. 860, 82 S.Ct. 949, 8 L.Ed.2d 18. However, *Jacksonville* which spoke for Florida only now apparently is but an historical marker for it now joins the many other cases where the highest state courts

for Florida because it "rests on an unsound and dangerous foundation" 296 F. 2d 256, 262, and because "the majority rule presumes that courts have the power to alleviate or eliminate this burden by construing the indemnity agreement in a manner which is patently inconsistent with the plain and clear meaning of the language employed by the contracting parties" and thus constitutes "a dangerous and unwarranted extension of the judicial function" 296 F.2d 256, 262, it recognized that the so-called majority rule had been fairly stated in Batson-Cook.[11] We described the process of contract construction in *Batson-Cook* this way. "[I]n this process, it is the law which steps in and tells the parties that while it need not be done in any particular language or form, unless the intention is unequivocally expressed in the plainest of words, the law will consider that the parties did not undertake to indemnify one against the consequences of his own negligence. The question then is: does the specific contract in dispute clearly reflect such a purpose?" 257 F.2d at 412.[12]

within the Fifth Circuit have declined to follow our *Erie* judgments. W. S. Ranch Co. v. Kaiser Steel Corp., 10 Cir., 1967, 388 F.2d 257, 264–65 n. 11–14, reversed, 1968, 391 U.S. 593, 88 S.Ct. 1753, 20 L.Ed.2d 835.

In Gulf Oil Corp. v. Atlantic Coast Line R.R., Fla.Dist.Ct.App., 1967, 196 So.2d 456, cert. denied, Fla., 1967, 201 So.2d 893, the Florida District Court of Appeal expressly declined to follow *Jacksonville* stating that there were strong indications since *Jacksonville* that Florida Courts would adopt the majority rule. After analyzing *Jacksonville*, the Florida cases, and rejecting it and the idea that a clause reading essentially the same as that in *Jacksonville* was adequate, the *Gulf* Court concluded: "It is evident, then, that Florida decisions hold that an indemnity agreement which indemnifies against the indemnitee's own negligence must state this in 'clear and unequivocal' language."

" * * * there must be language *specifically* designating indemnification against one's own negligence." 196 So.2d at 459. (Emphasis in original).

This authoritative choice by a Florida Court of Appeal bears the stamp of approval evidenced by the denial of certiorari by the Florida Supreme Court. Unlike the equivocal counterpart in the Federal system, denial of certiorari stands for much in Florida. As we said in Miami Parts & Spring, Inc. v. Champion Spark Plug Co., 5 Cir., 1966, 364 F.2d 957, 965–966, n. 7, quoting Hunter v. Tyner, 1942, 151 Fla. 707, 10 So.2d 492: "A writ of [certiorari] being simply a method of procedure by which such appeals authorized by the statute can be brought to this court, its denial, we think, was an adjudication of the propriety of the order involved and it could not again be questioned in this appeal."

We went on, quoting Advertects, Inc. v. Sawyer Indus., Fla., 1953, 64 So.2d 300: "The order appointing the receiver was reviewed by this Court on a petition for writ of certiorari and this Court affirmed the order of the Chancellor by denying the petition for writ of certiorari." 364 F.2d at 966.

We are not unmindful of a later Florida Appellate decision purporting to adopt the minority rule, Thomas Awning & Tent Co. v. Toby's Twelfth Cafeteria, Inc., Fla.Dist.Ct.App., 1967, 204 So.2d 756, where one Judge dissented on the basis of *Gulf, supra*. However, by direct communication with the Clerk of the Florida Supreme Court we are advised that certiorari was not applied for in that case. It is therefore our *Erie* judgment that the majority rule adopted for Florida in *Gulf, supra*, stands as the latest authoritative pronouncement of Florida Law.

11. Batson-Cook Co. v. Industrial Steel Erectors, 5 Cir., 1958, 257 F.2d 410. American Ag. Chem. Co. v. Tampa Armature Works, 5 Cir., 1963, 315 F.2d 856 (concurring opinion). This was, of course, an *Erie* declaration for Alabama which may have been superseded by the Alabama Supreme Court in Republic Steel Corp. v. Payne, 1961, 272 Ala. 483, 132 So.2d 581, 586.

12. In footnote 3 of *Batson-Cook* we were at pains to list the number of cases from this Court echoing this accepted principle and finding now an agreement which did cover the indemnitee's negligence and others holding to the contrary, depending upon the wording, setting, and other guides toward divination of the so-called intent of the parties.

We undertook also, to make quite plain that the contract need not contain the talismanic words "even though caused, occasioned or contributed to by the negligence, sole or concurrent of the

Of course, to state the rule which is a guide to the court's approach hardly determines the case. Indeed, the travail just begins. Except where the words are identical, little is to be gained by comparing this case with that, or matching this phraseology against another. Indeed, the same words frequently receive contradictory constructions at the hands of the highest appellate courts separated only by the imaginary boundary line of contiguous states. The "intention" of the parties is frequently more the statement of a result than a statement of a reason why. So much is wrapped up in the policy considerations which this or that jurisdiction considers within the proper scope of the judicial function or of critical relevance. See American Ag. Chem. Co. v. Tampa Armature Works, *supra* (concurring opinion). Added to this is the fact that for every similarity there is a dissimilarity. It begins and ends then as a matter of the law, that is, through the judicial function, construing the contract. That depends on that contract.

■ Wen we zero in on this particular contract (see note 2, *supra*) from the standpoint of the position of the parties at the time the contract was made,[13] we find no sign pointing unequivocally to a purpose on the part of a small subcontractor performing some integral part of a Government contract to take upon its shoulders the unlimited obligation either in terms of dollars or events precipitating damage to others when caused primarily by the active direct negligence of the Government simply because in the judicial scales some slight dereliction of the Contractor occurred which, among joint tort feasors the law would recognize. The very nature of the National Government argues against any but the largest of industrial enterprises as Governmental contractors, rationally undertaking such far-flung burdens. There is first the very size, the immensity, of Government. This is complicated more frequently as a matter of necessity, by security considerations which close to the private contractor any access to information, sometimes of the most rudimentary kind, by which a contractor could ascertain whether it was reasonably safe to rely upon the expectation that the Government would do its part to minimize risks in today's complex, frequently hazardous, Governmental contract operations. Of course, this is not to make the contract in terms here employed superfluous at all. The Contractor bears full responsibility for damage occasioned by his negligence alone or his negligence in connection with other contractors or subcontractors [14] or members of the public, excluding only the Government as indemnitee.[15] It also supplies a procedural device to assure effec-

Indemnitee," or like expressions. 257 F.2d at 412.

Although the District of Columbia Circuit accepts the majority rule's requirement that the intention to indemnify against the indemnitee's negligence must clearly appear, Moses-Ecco Co. v. Roscoe-Ajax Corp., 1963, 115 U.S.App.D.C. 366, 320 F.2d 685, 687 citing *Batson-Cook*, at 688 n. 2 it properly declined to follow it if it was read to require the presence of the talismanic words.

13. When dealing with the construction of a contract, the court must place itself in the place of the parties and determine their mutual intent. J. M. Huber Corp. v. Denman, 5 Cir., 1966, 367 F.2d 104; American Oil Co. v. Hart, 5 Cir., 1966, 356 F.2d 657; American Ag. Chem. Co. v. Tampa Armature Works, Inc., 5 Cir., 1963, 315 F.2d 856. Cf. Indemnity Ins. Co. of North America v. DuPont, 5 Cir., 1961, 292 F.2d 569; Fidelity-Phenix Fire Ins. Co. v. Farm Air Service, Inc., 5 Cir., 1958, 255 F.2d 658.

14. Cf. Travelers Ins. Co. v. Busy Elec. Co., 5 Cir., 1961, 294 F.2d 139; Halliburton Co. v. Norton Drilling Co., 5 Cir., 1962, 302 F.2d 431.

15. 41 Am.Jur.2d Indemnity § 16, at 703 (1968):

"Where the injury was caused by the concurrent negligence of the indemnitor and the indemnitee, the courts have frequently read into contracts of indemnity exceptions for injuries caused in part by the indemnitee, although there is authority to the contrary."

tive recourse by the negligence-free Government against the negligent Contractor.[16] The argument sometimes made, that contracts of this kind must be read to include the indemnitee's negligence, for otherwise there would be no occasion to demand hold-harmless indemnity, is extremely superficial. With stakes so high today, parties frequently pay out substantial, huge sums of money in settlement, frequently with the acquiescence and approval of the indemnitor, reserving questions vis-a-vis themselves for later determination. See, e. g., O'Neil Co. v. United States Fidelity & Guaranty Co., 5 Cir., 1967, 381 F.2d 783.

For these reasons the Government fails on its contract construction theory. But the Government, as do all other parties

today, when everything else fails, falls back on the Tinker-to-Evers-to-Chance multiple impleaders in the *Sieracki-Ryan-Yaka* situations of indemnity based upon breach of the WWLP—the breach of the warranty or workmanlike performance.[17] So far this Court has kept this newly formed concept strictly confined to salt water or at least amphibious applications.[18]

The Government has been found guilty of active negligence proximately causing substantial injuries to the Claimant. Contractor, even though guilty of some concurring negligence, has no obligation under this contract to indemnify the Government against the consequences of the Government's neglect.

Affirmed.

16. See, e. g., American Ag. Chem. Co. v. Tampa Armature Works, 5 Cir., 1963, 315 F.2d 856, 861 n. 3 (concurring opinion).

17. D/S Ove Skou v. Hebert, 5 Cir., 1966, 365 F.2d 341, 1966 A.M.C. 2223; United States Lines v. Williams, 5 Cir., 1966, 365 F.2d 332, 1966 A.M.C. 2418.

18. See Halliburton Co. v. Norton Drilling Co., 5 Cir., 1962, 302 F.2d 431, 436.

The United States urges for the resolution of this case the adoption of the implied-indemnity theory of Ryan Stevedoring Co. v. Pan-Atlantic Steamship Co., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133, which allowed indemnity to the shipowner from the stevedore because the stevedore "breached his duty to do the job safely" and his failure to do so gives rise to a cause of action in implied indemnity. This principle of law is indeed Federal in nature, but it is not the appropriate one for the resolution of this case. This Court in Halliburton Co. v. Norton Drilling Co., 5 Cir., 1962, 302 F.2d 431, 436, declined to apply Ryan. In fact, this Court held in Koninklyke v. Strachan Shipping Co., 5 Cir., 1962, 301 F.2d 741, that "the express indemnity agreement may have waived any possible implied one." In Centraal Strikstof Verkoopkanter v. Walsh Stevedoring Co., 5 Cir., 1967, 380 F.2d 523, this Court held that "[t]he implied warranty established in Ryan is a product of the admiralty courts and a creature of the admiralty law * * *. Those cases in which the doctrine has been applied have been admiralty cases which presented substantially similar circumstances to those existing in *Ryan*." Id. at 529.