**JAMES F. O'NEIL COMPANY, Inc., Appellant,**

v.

**UNITED STATES FIDELITY & GUARANTY COMPANY, Appellee.**

**No. 24134.**

United States Court of Appeals Fifth Circuit.

Aug. 15, 1967.

Stanley E. Loeb, George M. Leppert, New Orleans, La., for appellant.

Albert J. Huddleston, New Orleans, La., for appellee.

Before RIVES and DYER, Circuit Judges, and JOHNSON, District Judge.

RIVES, Circuit Judge:

This appeal is from a judgment for United States Fidelity & Guaranty Company (USF&G), as assignee and subrogee of Blount Brothers Construction Company (Blount), against James F. O'Neil Company, Inc. (O'Neil) in the sum of $35,886.82. This was the amount paid and the legal fees and expenses incurred in settlement of a wrongful death claim by the widow of an O'Neil employee. Blount was the prime contractor with United States Atomic Energy Commission for the construction of a "Feed Plant Facility" in the State of Ohio, and O'Neil was Blount's subcontractor for certain mechanical work.

John E. Parsons, an employee of O'Neil, while performing labor encompassed by the subcontract, was electrocuted when the boom of a crane came into contact with a high voltage line over the work area. His widow and administratrix filed suit against Blount in the United States District Court for the Southern District of Ohio. The trial resulted in a judgment on a directed verdict for Blount. On appeal the Sixth Circuit reversed.[1] holding that the evidence presented jury questions both as to negligence of Blount and contributory negligence of Parsons. USF&G, as Blount's liability insurer, then settled with Parson's widow and administratrix. No question is raised as to the reasonableness of either the amount paid in settlement, $27,500.00, or of the

---

1. Parsons v. Blount Brothers Construction Co., 6 Cir. 1960, 281 F.2d 414.

legal fees and expenses which come to $7,632.47. It is conceded that USF&G is subrogated to any indemnity rights of Blount under its subcontract with O'Neil. That subcontract contained the following provisions:

"Article IX—(a) Sub-contractor shall indemnify Contractor against all claims for damages arising from accidents to persons or property occasioned by the Sub-contractor, his agents or employees; and Sub-contractor shall defend all suits brought against the Contractor on account of any such accidents and shall reimburse Contractor for any expense, including reasonable attorney's fee, sustained by Contractor by reason of such accidents.

"(b) Sub-contractor shall carry public liability insurance and also such employers liability or workmen's compensation insurance as may be necessary to insure the liability of the parties hereto for any injuries to Sub-contractor's employees, and all insurance required by the law of the place where the said work is to be done, and shall furnish Contractor with satisfactory evidence that such insurance has been obtained and paid for and will continue in force until the completion of said work, and if the Sub-contractor should sublet any of this work to a third party, Sub-contractor shall see that said third party shall do likewise."

In the present suit, USF&G seeks indemnity from O'Neil under the terms of Article IX(a) of the subcontract. The parties agree that Ohio law is controlling. The case was submitted to the district court without a jury for decision on the merits as to both the facts and the law, upon a record composed of stipulations, exhibits and the transcript of the original trial in Ohio of the case of Parsons' widow and administratrix against Blount. The district court held that the indemnity agreement protected Blount whether or not Blount was negligent. It further held that the sole proximate cause of the accident was the negligence of the crane operator and of Parsons, both employees of O'Neil. Judgment was accordingly entered in favor of USF&G against O'Neil for $35,886.82. We reverse.

We repeat the most pertinent language in the subcontract: "Sub-contractor shall indemnify Contractor against all claims for damages arising from accidents to persons or property occasioned by the Sub-contractor, his agents or employees." The district court relied principally upon New Amsterdam Casualty Co. v. Kilroy Structural Steel Co., Ohio App.1959, 159 N.E.2d 797, and St. Paul Mercury Indemnity Co. v. Kopp, Ohio App.1954, 121 N.E. 2d 23; and indicated that, "The indemnity provisions in the cited cases are almost identical to those in the instant case." Both cases considered language making one party liable for all losses or damages growing out of or incidental to the work involved. The rationale of the Ohio court in construing such clauses was well expressed in St. Paul Mercury Indemnity Co. v. Kopp, supra, 121 N.E.2d at 25:

"When we read paragraph 7 of the contract we find that it says that Fred L. Nelson 'will indemnify and save harmless' the Utility Company from any and all loss * * * including * * * death suffered by an employee of Fred L. Nelson 'growing out of or in any way connected with' the work which Fred L. Nelson is doing for the Utility Company. Although no specific mention is made of the negligence of the Utility Company, yet the contract, when it calls for indemnity for any and all loss in any way connected with the performance of the work awarded to Fred L. Nelson, clearly includes loss arising as a result of such negligence. See Annotation in 175 A.L.R. 12 et seq."

The indemnity contracts in the cases relied on by the district court were "geared to the job," and were broad enough to include the negligence of the indemnitee, while the agreement in this

case is limited to claims arising from accidents "occasioned by Sub-contractor, his agents or employees." [2]

■■■ We agree with the district court that under Ohio law contracts which clearly and unequivocally relieve one from the results of his own negligence are not contrary to public policy. George H. Dingledy Lumber Co. v. Erie R. Co., 102 Ohio St. 236, 131 N.E. 723 (1921); St. Paul Mercury Indemnity Co. v. Kopp, supra. Nor is the word "negligence" sacrosanct, if the language expresses a clear intention to hold the negligent indemnitee harmless. General Acc. F. & L. Assur. Corp., Ltd. v. Smith & Oby Co., 6 Cir. 1959, 272 F.2d 581, 584, 77 A.L.R.2d 1134; George H. Dingledy Lumber Co. v. Erie R. Co., supra. However, Ohio also recognizes that "while such a contract of indemnification is not strictly against public policy, it so nearly borders on the line, that a strict construction against the one to be indemnified for his own negligence is necessary." Zurich General Accident & Liability Ins. Co. v. Liberman, Ohio Com.Pl. 1947, 71 N.E.2d 281.[3]

■■■ In the present case, O'Neil agreed to indemnify Blount against claims arising from accidents occasioned by O'Neil. It cannot be reasonably argued that such an agreement is broad enough to include claims arising from accidents occasioned solely by Blount. Applying the Ohio rule of strict construction against indemnity for one's own negligence, we hold that O'Neil did not agree to indemnify Blount against claims arising from accidents occasioned both by O'Neil and by Blount; that is, against claims arising from Blount's concurrent negligence.

■■■ We think it clear that Parsons' death proximately resulted from the con-current negligence of both O'Neil and Blount. Only a brief summary of the pertinent facts is necessary. A detailed recital of the relevant events may be found in the Sixth Circuit's opinion. 281 F.2d at 415–416.

On the day of the accident, Parsons, a pipe-fitter, was engaged in shifting pipes from one pile to another. The pipes were stockpiled under three uninsulated high-tension wires, energized with 13,800 volts of electricity, which traversed the construction area. Parsons would hook a length of pipe to the cable of a hydro-crane and the hydro-crane operator, Hobart Johnson, would swing the pipe from one pile to another. The hydro-crane was mounted on the bed of a truck. It had a telescoping boom, which could be extended or withdrawn depending on the nature of the work to be done. Fully extended, this hydro-crane had a maximum height of 32 feet.

The accident occurred in the course of moving pipes when the boom of the crane in the extended position touched the overhead high-tension wires. Parsons, who was guiding the pipes, and was therefore in contact with the hydro-crane was immediately electrocuted.

It is undisputed that Blount, through its safety engineer William McClurg, was charged with the duty of correcting any safety hazards in the construction area. The Sixth Circuit has prescribed the governing rules for this case: If Blount had custody and control over the premises where the work was being performed, then it owed Parsons "a duty to provide him with a place of employment which was as safe and free from danger as the nature of the employment would reasonably permit." The court then noted:

"The existence of hazards which could be eliminated by the exercise of

---

2. Ohio law equates the word "occasioned" with "caused." Dayton Fabricated Steel Co. v. Dayton Town & County, Inc., 1954, 99 Ohio App. 309, 133 N.E.2d 423, 426.

3. General Acc. F. & L. Assur. Corp., Ltd. v. Smith & Oby Co., 6 Cir. 1959, 272 F. 2d 581, 583, 77 A.L.R.2d 1134; New Amsterdam Casualty Co. v. Kilroy Structural Steel Co., Ohio App.1959, 159 N.E.2d 797; Dayton Fabricated Steel Co. v. Dayton Town & Country, Inc., 1954, 99 Ohio App. 309, 133 N.E.2d 423; St. Paul Mercury Indemnity Co. v. Kopp, Ohio App. 1954, 121 N.E.2d 23.

ordinary care by those in custody and control of the premises cannot be considered as inherent hazards necessarily present because of the character of the work to be done."

281 F.2d at 417. The district court held Blount did not have the necessary custody or control as to be obligated to eliminate the hazard which caused Parsons' death. Further, the district court found that Blount was not remiss in providing Parsons "with a place of employment which was safe and free from danger as the nature of the employment would reasonably permit."

The transcript from the Ohio proceedings clearly shows that Blount had custody and control of the job site. Blount was responsible for safety features and abatement of hazards. The record shows that on several other occasions McClurg asked Johnson to cease a particular operation in a manner which McClurg considered dangerous and Johnson complied with the requests. The Sixth Circuit recognized that the primary issue was not whether Blount controlled all aspects of the construction work, but whether it was responsible for eliminating hazards. We think that it had such responsibility.[4]

The Ohio record reveals that a hazard existed which could have been eliminated by the exercise of ordinary care by Blount's safety engineer. Failing to so eliminate the hazard left the job site a place not "safe and free from dangers as the nature of the employment would reasonably permit." Though repetitious, we think it useful to restate the evidence as summarized by the Sixth Circuit:

"Blount knew that the hydro-crane was required to and did operate extensively in the construction area and under the uninsulated high-tension wires carrying 13,800 volts of electricity. Yet Blount's safety man McClurg admitted on cross-examination that prior to the accident he had not determined the height of the high-tension wires above the ground or the height of the boom.

"McClurg further admitted that there was quite a distance between the poles on which the high-tension wires had been attached and 'due to atmospheric conditions that there will come an awful swag in these lines. When it is cold the lines will tighten up; when it is warm they will loosen. There will be a swag in it due to the warmth in the air.' It was fairly warm on the day the accident occurred. McClurg never told Johnson or decedent to watch out for these particular lines. There is no evidence that he warned them of the effect of atmospheric conditions on the wires."

281 F.2d at 417–418.

The hazard had existed for a long time. McClurg was aware that the pipes were located under the high-tension wires, but made no effort to ascertain the relative height of the wires and length of the boom or to determine whether there was any possibility of the boom hitting the wires. His negligence in performing his duties as safety engineer seems quite apparent, and was undoubtedly a proximate cause of Parsons' death. The negligence of Blount's employee prevents USF&G from recovering under the indemnity contract.

The judgment is reversed and the cause remanded with directions to enter judgment for O'Neil, the defendant.

Reversed with directions.

4. After the accident McClurg ordered the locking and welding of the boom into a shortened position. The Sixth Circuit said such evidence is admissible for the limited purpose of proving that Blount had the authority to control the safe operation of the hydro-crane.