**SECURITY INSURANCE COMPANY OF HARTFORD, Plaintiff-Appellee,**

v.

**A. G. WIMPY and A. G. Wimpy Company, Inc. et al., Defendants-Appellants.**

No. 71–1839.

United States Court of Appeals, Fifth Circuit.

March 8, 1973.

W. Woodrow Stewart, Joe K. Telford, Gainesville, Ga., for defendants-appellants.

B. Carl Buice, Gainesville, Ga., for plaintiff-appellee.

Before JOHN R. BROWN, Chief Judge, and INGRAHAM and RONEY, Circuit Judges.

JOHN R. BROWN, Chief Judge.

As a rare animal too often neglected and overlooked as aggrieved parties sur-

vey the appellate zoo, this case comes to us on an agreed statement, F.R.A.P. 10(d).[1] It presents for decision the computation of correct premiums under a retrospective rating plan[2] where the Insurer cancels before the expiration of the last year of a three year policy period[3] because of adverse loss experience on the part of the Assured. The trial court held for the Insurer and the Assured appeals. We reverse.

In the quest for the answer the problem comes down to making sense out of non-sense. In more austere language, the problem is interpreting, or more accurately trying to interpret, the specific terms of the cancellation provision of Plan D.[4]

The facts are extremely simple. The Insurer issued its first policy to Assured on April 3, 1965. On April 3, 1966, Insurer issued a similar renewal policy for another year's coverage. Because of Assured's poor loss experience during the first two years of coverage, Insurer decided on April 3, 1967, that it would is-

---

1. The trial submission was virtually all on stipulation.

2. The agreed statement (AGS) states: "Restrospective rating is based on premiums, which have been developed through past experience, or other individual rating of risk. Manual rates are adjusted to reflect the experience of the individual concern, as it differs from the industry as a whole. This is experience rating, and is prospective rating. In other words, the experience of the past is taken as an indication of the experience expected for the renewal policy period. Restrospective Rating is nothing more than a practical method of determining current rates from the basis of current losses and this is superimposed upon the experience rate. The plan utilized in connection with the policies concerned in this action was Plan 'D'.

The basic premium is expressed as a percentage of the standard premium, and includes such items as acquisition cost, branch office expense, home office administration and audit expense, engineering and bureau expenses, profit and contingencies. The minimum premium is the least amount of money that the insurance company may charge in the event of excellent experience on behalf of the insured, and is usually expressed as a percentage of the standard premium. The maximum premium on the other hand is the maximum amount of money the insurance company may charge, if the loss record of the insured is poor, and this is expressed as a percentage of the standard premium. * * *

* * * * *

The formula used in determining the final Retrospective Premium is as follows: Retrospective Premium = [basic premium + excess loss premium + (incurred losses x loss conversion factor)] x tax multiplier, subject to minimum and maximum retrospective premiums."

3. "To make this plan more attractive it is usually written for more than one year. The plan in the instant case was written for three years." (AGS).

We agree, however, with Insurer that this contemplated the issuance of renewal policies for the second and third years.

4. For ease of reference we have inserted [i] and [ii] in the introductory par. 5:
5. Cancelation.
*The cancelation or non-renewal, prior to the end of the three-year period,* of any policy designated in Table I *shall [i] be deemed to be cancelation of the retrospective rating plan, and [ii] the premium* for insurance subject to Plan D for the period such policies have been in force *shall be computed in accordance with the other provisions of this endorsement, provided:*

(a) *Cancelation by the named insured.* In the event of cancelation by the named insured, (1) the standard premium shall be computed as the sum of the audited standard premium for all completed annual periods and the short rate standard premium for the period in which cancelation is effective; the minimum retrospective premium shall be the standard premium so computed; (2) in computing the maximum retrospective premium, the standard premium shall be computed as the sum of the audited standard premium to the date of cancelation and the estimated standard premium from the date of cancelation to the end of the three year period.

(b) *Cancelation by the company.* In the event of cancelation by the company *because of non-payment of premium* by the named insured, the maximum retrospective premium shall be computed on the basis of the audited standard premium from the beginning of the three year

sue a policy effective only until June 15, 1967. By any realistic view of the facts this action must be classed as a cancellation of present and future insurance coverage.

Assured paid the standard premium for this twenty-six months' coverage. Insurer then determined that the very same loss experience for which it cancelled the insurance warranted it in assessing the 150% maximum additional premium under the Retrospective Premium Endorsement.[5]

The applicability of Retrospective Premium Plan D in the event of such a cancellation presents the legal issue of contract construction. Assured contends that the relevant contract provisions are ambiguous and, therefore, the general canon of construction for standard form contracts obliges us to construe them against Insurer. American Fidelity and Casualty Co. v. St. Paul Mercury Indemnity Co., 5 Cir., 1957, 248 F.2d 509; Ketona Chemical Corp. v. Globe Indemnity Co., 5 Cir., 1968, 404 F.2d 181; Southeastern Fidelity Insurance Co. v. McDonald, Ga., 1972, 125 Ga.App. 394, 188 S.E.2d 162.

On this work-a-day problem we first must examine the provisions of the insurance policy and Plan D to see whether the language fairly construed the parties' intentions for this contingency.

Paragraph 5 of Plan D provides that the "cancellation or non-renewal, prior to the end of the three year period of any policy designated in Table I shall be deemed to be cancellation of the retrospective rating plan" (see par. 5[i], note 4, *supra*). Assuming that this phrase means what it says, Insurer's claim to the additional premiums based

on the Retrospective Rating Plan up to the date of cancellation cannot stand.

Insurer contends, however, that the phrase merely effectuates a cancellation of the Retrospective Rating Plan for future coverage and does not affect the earned premium to date. It buttresses this contention by emphasizing clause (ii): "and the premium for insurance subject to Plan D for the period such policies have been in force shall be computed in accordance with the other provision of this endorsement" (par. 5 [ii], note 4, *supra*).

But this hardly helps Insurer. First, if as Insurer contends the "other provision of this endorsement" means the retrospective rating plan, then the entire cancellation clause would read as follows: "The cancellation or non-renewal, prior to the end of the three year period of any policy designated in Table I shall be deemed to be cancellation of the retrospective rating plan, and the premium for insurance subject to Plan D for the period such policies have been in force shall be computed in accordance with the retrospective rating plan."

That is either ambiguous or question-begging in the sense that it does not provide the answer to just *what* the retrospective rating plan would then prescribe. And probably what is more important, the argument conveniently ignores that little, simple but often troublesome, portentous "provided". Provided *what*?

Provided what? is the key to this case. And it leads us to a decision not reached elsewhere or in the Court below.

Article 5 (note 4, *supra*) specifically takes care of several situations. In 5(a) the policy deals with cancellations by the

---

period to the date of cancelation and the estimated standard premium for the balance of the three year period.

(c) *Cancelation of part of insured's operations.* Neither the insured nor the company may cancel the insurance applying to a part of the operations of the insured. (Emphasis supplied).

5. Applying Plan D under which the minimum retrospective premium was 60% of the standard premium, and the maximum 150%, the Insurer claimed and the Court awarded:

| | |
|---|---|
| 150% standard premium | $107,492 |
| Less: standard premium | 71,661 |
| Amount due | $ 35,831 |

Assured. By the operation of sub-par (1) the minimum retrospective premium is the [i] standard premium for all closed years plus [ii] the short rate standard premium for the period covered in the year of cancellation. The Assured gets no possible benefit from good experience since it must pay the standard premium for closed years and bear the much higher short rate premiums for the incompleted period of cancellation. But as proof that the Plan D is to penalize—and hence discourage cancellation by the Assured—it may even be much worse. Clause (2) fixes maximum retrospective premium as the sum of the audited standard premium, not up to the end of the closed years, but up to the date of cancellation, and the estimated standard premium to the end of the third year.

Under this formula Assured can get no benefit from good experience although under the maximum formula just summarized it may have to bear a substantial added burden for bad experience to the extent that (i) its completed experience justified a refund or (ii) the estimated standard premium for the remainder of the policy term exceeded

what would be payable either under short rate or actual experience or both.

In short, 5(a) prescribes in detail the consequences in terms of the added costs imposed on a cancelling Assured. For this situation the "provided" makes clause 5 [i] absolute and obliterates almost altogether any operative effect of clause 5 [ii] because it is now clear that it is standard and short rates, actual or estimated, which alone control.[6]

When it comes to cancellation by Insurer the Provided what? is limited to cancellations for non-payment of premiums by Assured. This is again a powerful stimulant not only to continue coverage but to pay premiums. For the consequence on Assured is the same as 5(a)(2).

Provided what? does not even begin to cover cancellation for bad loss experience. In view of that, there is no proviso to clause 5 [ii] which clearly prescribes that the premium for the period the insurance is effective "shall be computed in accordance with the *other* provisions of" Plan D. This brings into play paragraph 4 covering computations of premiums on a continuous three year retrospective basis.[7]

---

6. The only possible operative effect left by 5[ii] is perhaps to put a ceiling of 150% on the maximum.

7. 4. Payments and Computations of Premium for Insurance Subject to Plan D.

   (a) Standard Premium. The named insured shall pay the standard premium to the company in accordance with the provisions of the policies, other than this endorsement, specifying the manner of premium payment.

   (b) Retrospective Premium. A computation of the retrospective premium applicable to the first annual period, based upon the standard premium and incurred losses for such period, such losses to be valued as of a date six months after the expiration of such period, shall be made by the company as soon as practicable after such valuation date. A computation of the retrospective premium, applicable to the first two annual periods, based upon the standard premium and incurred losses for such periods, such losses to be valued as of a date six months after the expiration of the second annual period, shall be made by the company as soon as practicable after such valuation date.

   A computation of the retrospective premium, based upon the standard premium and incurred losses for the three year period, such losses to be valued as of a date six months after the expiration of such period, shall be made by the company as soon as practicable after such valuation date.

   Such computation of the retrospective premium for the three year period shall be final if (1) all claims have been closed or it is apparent that the retrospective premium will exceed the maximum retrospective premium, and (2) within ninety days from approval of such computation by the organization having jurisdiction, the company, with the agreement of the insured, requests of such

Under par. 4 the concept of this rating plan (see note 4, *supra* [from AGS] is that Assured will be allowed to average his experience over the three year period. The computation is remade as each successive year is closed. If on the three year basis the loss experience calls for additional premiums, Assured must, up to 150%, pay them. If, on the contrary, loss experience calls for lesser premiums, Insurer must repay them.

Obviously it would be unfair in the absence of clear language to the contrary to allow Insurer to unilaterally cut off the right of Assured to have the benefit under the premium formula of what the post-cancellation experience would have afforded.[8]

On the other hand there are no equities which would justify affording Assured more benefits than would have been received had Insurer not cancelled. And certainly nothing in the words used in Plan D either require or suggest such a result.

In this way the concept of leveling-off is kept intact. Neither party is prejudiced. Each is required merely to live up to his obligation to pay more or refund depending on loss experience. And it keeps faith with the plain words of clause 5 [ii].

Insurer may make the beguiling argument that allowing cancellation as we do (note 8, *supra*) this further application of par. 4 of Plan D anomously calls for continuation of the insurance without receipt of premiums. This is not so at all. Assured has no coverage from the date of cancellation. But, in computing the adjusted premium for the period from the attachment of the risk to the time of cancellation Assured's loss experience for the post-cancellation period has to be taken into account with the pre-cancellation experience.[9] What this

organization that the computation be final.

If such computation is not final, a further computation of the retrospective premium, based upon incurred losses valued as of a date eighteen months after termination of the policies, shall be made by the company as soon as practicable after such valuation date. Such further computation shall be final unless, within ninety days from approval of such computation by the organization having jurisdiction, the company or the named insured requests of such organization that a further computation be authorized. Any subsequent computations, to be made only at intervals of twelve months, shall each be subject to a similar procedure.

If the named insured disposes of his entire interest in the operations covered by the policies, or makes an assignment for the benefit of creditors, or is in a legal proceeding reorganized or declared bankrupt or insolvent, and if the retrospective premium as of the date of such change of status is greater than the standard premium for insurance to such date, the company may compute the retrospective premium as of such date, as soon as practicable thereafter.

After each computation, if the premium thus computed exceeds the premium paid for insurance subject to Plan D, the named insured shall pay the difference to the company; if less, the company shall return the difference to the named insured.

8. This is not to hold in a left-handed way that Insurer could not cancel for bad experience. We simply say that exercising that right, Insurer had to recognize that for the balance of the three year term it runs the risk of substantial credits if Assured's post-cancellation experience warrants it.

9. The correct method of computation we leave to the trial Court on remand, but it is not as complex as might first appear. On the hypothesis that post-cancellation would produce a credit for refund there would be no occasion for an offset for the premiums theoretically payable (but not paid) for the post-cancellation period. On the other hand, if post-cancellation experience would not produce a credit it would mean that Assured would be liable for the full retrospective premium computed on the basis of the experience from inception to cancellation not to exceed, of course, 150% of the standard premium for that period. In this way Assured would get the benefit of any post-cancellation credit, but in no case would Assured be liable in excess of the retrospective

really amounts to is an application of the law's traditional technique used in a variety of situations of determining or measuring consequences for past conduct by subsequent events.

■ This course seems eminently preferable to following the easy way out of finding an ambiguity and then giving the full break to Assured,[10] thus in effect imposing the full burden on Insurer for the cancellation we have held to be permissible. And this is so even though other Courts have taken the ambiguity route to reach opposite results.[11]

Perhaps we add to the ambiguity [12] by not relying on it. But we think we finally make sense of non-sense, interpret the bargain thereby, hold both parties to it and leave to the District Court the task of determining on remand and fur-

ther proceedings the dollar consequences which this reading requires.[13]

Reversed and remanded.

RONEY, Circuit Judge (dissenting):

I agree that the judgment of the district court should be reversed, but I would hold that the plaintiff insurance company is entitled to standard premiums only and is not entitled to collect retrospective premiums.

This is a diversity case from Georgia and should be decided under Georgia law. The only Georgia case cited to us is Travelers Indemnity Co. v. Horace F. Allison d/b/a H. F. Allison Contract Hauling, Civil Action No. K–12,658, July 15, 1968, Hall County Georgia Superior Court. Although not compelling authority, it is the only Georgia law on point

---

rating premium computed to date of cancellation solely on the basis of pre-cancellation loss experience. Nor should it be, since the most Insurer should get is the maximum amount permitted under the formula for coverage afforded to date of cancellation.

10. Falling back on ambiguity to give Assured here the standard premium basis where it is *less* than the retrospective rate would, as a Georgia-*Erie* precedent, compel us to apply this reading of Plan D to the next case of an Insurer pre-expiration cancellation where the standard premium would be *more* than Assured's retrospective rate up to date of cancellation. The doctrine of ambiguity permits the Court to construe it most favorably to Assured. But the process is construction, not contemporary equitable adjustment. Once construed, it must be applied evenhandedly, not on a basis of achieving the least dollar cost to Assured in the case of the day.

11. Bituminous Casualty Corp. v. Lewis Crane Service, Inc., Fla.App., 1965, 173 So.2d 715, held that the language involved clearly *contemplated application of the* retrospective rating plan to periods of past coverage regardless of who cancelled the policy or why. See also Wimpy v. Maryland Casualty Co., 5 Cir., 1955, 223 F.2d 649, involving different policy language. Two others found the policies to be severely lacking in clarity, Bituminous Casualty Corp. v. Swartout, Minn., 1965,

270 Minn. 216, 133 N.W.2d 32; Traveler's Insurance Com. v. Jeffries-Eaves, Inc., Colo., 1968, 166 Colo. 220, 442 P.2d 822, and limited recovery to the standard premium.

12. We do not have to determine whether we should apply the suggestion in Boston Insurance Co. v. Gable, 5 Cir., 1965, 352 F.2d 368, 370, that when courts arrive at contrary conclusions on identical wording it must be ambiguous. This simplified approach submerges local policy considerations which frequently vary from state to state, especially in insurance problems. See American Agricultural Chemical Co. v. Tampa Armature Works, 5 Cir., 1963, 315 F.2d 856, 862–863 (Brown, J. concurring). Cf. United States v. Seckinger, 1970, 397 U.S. 203, 90 S.Ct. 880, 25 L.Ed. 2d 224, reversing 5 Cir., 1969, 408 F.2d 146.

13. We are not the first tribunal to toil in this field. Several appellate courts have muddled along in an attempt to make sense of non-sense and find the golden fleece—"provided what?". See note 11 *supra.* Perhaps our efforts have been somewhat clumsy. But if the result is unsatisfactory, it is not the responsibility of the judiciary. Speaking from the disinterested vantage of the judiciary, we can only express our hope that if the insurance fraternity is displeased with this result, that it will do the natural thing and provide *what.*

and is from a Georgia court located within the jurisdiction of the district court. There is no reason for a federal court not to follow it. The Georgia court recognized that there are good arguments on both sides of this question, but held that the ambiguity of the policy requires the resolution of the conflict against the insurer, which wrote the policy.

Of the cases cited from other jurisdictions which involved the identical cancellation clause, two were decided in favor of the insured, Bituminous Casualty Corp. v. Swartout, 270 Minn. 216, 133 N.W.2d 32 (Minn.1965); Traveler's Insurance Co. v. Jeffries-Eaves, Inc., 166 Colo. 220, 442 P.2d 822 (1968), and one was decided in favor of the insurer, Bituminous Casualty Corp. v. Lewis Crane Service, Inc., 173 So.2d 715 (Fla.App. 1965). The wording of the cancellation clause was materially different in Wimpy v. Maryland Casualty Co., 223 F.2d 649 (5th Cir. 1955).